SUN OIL COMPANY (DELAWARE),
Petitioner,

v.

Martha Foster MADELEY, et
al., Respondents.

No. C-120.

Supreme Court of Texas.

Dec. 16, 1981.

Rehearing Denied Feb. 10, 1982.

Julius L. Lybrand, Dallas, McGinnis, Lochridge & Kilgore, Robert C. McGinnis, Rick Harrison and Marc O. Knisely, Austin, Strasburger & Price, Leo J. Hoffman, Dallas, for petitioner.

Baker & Botts, William R. Choate and Frank G. Harmon, Houston, for respondents.

GREENHILL, Chief Justice.

This case involves the construction of an oil and gas lease. It provides a ⅛th royalty, about which there is no problem. It is also not disputed that the lease reserves to lessors one-half the net profits from the ⅞ths working interest oil. The principal issue is whether lessors are entitled to one-half the proceeds from the ⅞ths working interest gas, casinghead gas and condensate ("working interest gas").

Martha Foster Madeley and others, as lessors, brought suit against Sun Oil Company, as lessee, for declaratory judgment as to the proper interpretation of the lease and for recovery of damages. Both the lessors and Sun moved for summary judgment.

After severing lessors' claim for attorney's fees, the trial court granted lessors' motion for summary judgment. The trial court found that the lease obligated Sun to account to lessors "for one-half of the ⅞ths working interest oil, including condensate, and one-half of the ⅞ths working interest gas, including casinghead gas" and awarded damages. The court of civil appeals affirmed. 610 S.W.2d 798. On motion for rehearing one justice dissented. The dissent was of the view that the majority had impermissibly considered extrinsic evidence in arriving at the meaning of an admittedly unambiguous contract.

Although Sun and lessors cannot agree on the interpretation of the lease, they do agree that the lease is unambiguous. We also consider the lease unambiguous. Our interpretation of it is that the lease does not require that Sun pay lessors the proceeds from one-half the working interest gas, casinghead gas or condensate. Accordingly, the judgments of the courts below are reversed. We render judgment that lessors take nothing.

In December 1932, W. N. Foster and Keystone Mills Company, the two original lessors, executed the lease in controversy. The lease was very favorable to lessors because the property was near existing oil production and because Foster, an attorney knowledgeable in oil and gas matters, understood the value of lessors' property. From the commencement of production until 1977, the amount of gas produced was relatively small. Sun paid lessors the royalties, and one-half the working interest oil and one-half the working interest gas. In 1977, however, Sun completed gas wells in a deeper zone capable of producing larger volumes of gas. Sun thereafter revoked the division orders under which it had previously paid lessors one-half of the working interest gas. It claimed that these payments were not required by the lease. Lessors responded by filing the present action seeking a declaratory judgment interpreting lessors' rights under the lease and for damages for payments wrongfully withheld by Sun.

As stated, Sun and lessors agree there is no ambiguity in the provision of the 1932 lease. The parties, however, construe the lease quite differently with respect to their rights to the proceeds from working interest gas. Lessors maintain that, from the four corners of the lease, the intention is plainly expressed that the parties are to share the entire working interest equally. This interpretation of the lease is confirmed, lessors submit, by Sun's conduct of accounting to them for one-half the entire working interest for over forty years. Sun contends, on the other hand, that lessors' right to the profits from production can be established only by express reservation in the lease, and that the lease reserves to lessors one-half of the working interest oil, but no part of the working interest gas. Since mere disagreement over the interpretation of the lease does not make it ambiguous, we must determine which party's interpretation is correct.

In construing this lease, it is our task to seek the intention of the parties as

that intention is expressed in the lease. *McMahon v. Christmann*, 157 Tex. 403, 303 S.W.2d 341 (1957). The courts will enforce an unambiguous instrument as written; and, in the ordinary case, the writing alone will be deemed to express the intention of the parties. *Rutherford v. Randall*, 593 S.W.2d 949 (Tex.1980); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex.1968); *Smith v. Liddell*, 367 S.W.2d 662 (Tex.1963); *Woods v. Sims*, 154 Tex. 59, 273 S.W.2d 617 (1955).

The lease provides for customary royalties. Each of the various substances expected to be produced from the premises is distinguished in Subdivision IV of the lease which provides in part:

Royalties to be paid by Lessee are:

(a) On Oil, One-Eighth (⅛) of that produced and saved from said land, to be delivered to the credit of Lessors into the pipe line to which the wells may be connected;

(b) On Gas, including Casinghead Gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of One-Eighth (⅛) of the gas sold or used; provided that on gas sold at wells the royalty shall be One-Eighth (⅛) of the amount realized from such sales; where gas from a well producing gas only is not sold or used, Lessee may pay as royalty Fifty Dollars ($50.00) per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph III hereof; and,

(c) On all other minerals mined and marketed, One-Tenth (1/10) either in kind or value at the well or mine, at Lessee's election, except on Sulphur the royalty shall be One Dollar ($1.00) per long ton.

From this Subdivision it is apparent the parties understood the difference between oil and gas and intended to treat each substance separately.[1]

Subdivision V is an unusual provision but there is no dispute regarding its effect. The parties agree that this Subdivision pertains solely to working interest oil. Subdivision V provides, in part:

In addition to the royalty provided for in the preceding paragraph, Lessee shall deliver to Lessors . . . one-half of the oil accruing to the seven-eighths working interest from that produced and saved from said land, same to be delivered in the same manner as provided for the delivery of said royalty oil; subject, however, to the deductions and charges hereinafter provided. . . .

Subdivision V then obligates Sun to purchase or sell lessors' share of working interest oil after deducting the charges provided in Subdivisions VIII and IX.

The parties' major point of disagreement is the proper construction of Subdivision VIII, which provides:

Lessee shall bear all costs and expense of drilling, completing and equipping all wells drilled hereunder, including the cost of drilling derrick, casing, Christmas tree and other equipment necessary to complete said wells; such equipment, however, to be and remain the property of Lessee. Lessors, however, shall bear, and Lessee shall charge them, as hereafter provided, with One-Half of the cost and expense of producing and lifting oil produced on the premises, and in this connection Lessee shall set up on its books an account which shall reflect all costs, expenses and expenditures in connection with the lifting or producing of such oil, including gross production or severance taxes and also all investment properly chargeable for that purpose, such as

---

1. The royalty clause expressly mentions oil, gas and casinghead gas but does not mention condensate by name. Condensate, however, is a saturated gas produced from a gas well and in our view, would be included under Subdivision IV(b) as "other gaseous substance." *See, Lone*

*Star Gas Co. v. Stine*, 41 S.W.2d 48 (Tex. Comm.App.1931, jdgmt adopted); *Blocker v. Christie, Mitchell & Mitchell Co.*, 340 S.W.2d 320 (Tex.Civ.App.—Ft. Worth 1960, writ ref'd n. r. e.).

(without limitation by enumeration) production tanks, lead lines, treaters, fresh water system, pumping equipment, warehouses and in general all material and equipment necessary for the producing, lifting and preparation for market of said oil, which equipment shall be owned by the parties hereto in the proportions of their contributions to its cost; said account to reflect and include production equipment and production or lifting expense in the manner customarily set up in oil field accounting, and shall include a charge of Six Per Cent (6%) on the amount thereof to cover overhead expense; and said account shall also reflect all receipts and revenues for oil, gas and other minerals produced and saved hereunder. It is specifically understood and agreed that Lessors shall be charged with their share of said lifting and production costs and equipment as above provided, such charge to be made against and deducted from the proceeds of the oil purchased by Lessee or the proceeds received by Lessee for the account of lessors as provided in Paragraph V above, exclusive of royalty oil, there being no obligation on the part of Lessors to pay any portion of said costs and expenses in any other manner; it being the intention that Lessee shall advance all monies, materials and equipment required to lift and produce said oil as above provided, and shall reimburse itself out of the proceeds of Lessors' One-Half of the working interest oil purchased by Lessee from Lessors, or the proceeds received by Lessee for the account of Lessors.

This provision requires Sun to bear the costs of drilling and completing the wells.

2. Subdivision XVI provides:

Any increase in ad valorem taxes assessed against the lands included in this lease by reason of the discovery and production of oil thereon, under this lease, shall be borne fifty-six and twenty-five hundreths (56.25) per cent by Lessors and forty-three and seventy-five (43.75) per cent by Lessee; provided, however, that if the royalty and working interest shall be separately assessed, then Lessors shall pay all taxes on the royalty interest in and surface of said land, and one-half of

The subdivision, however, also establishes a joint account against which the expenses of producing and lifting the oil, including a 6% overhead factor, is to be charged. Subdivision VIII goes on to provide that the joint account "shall also reflect all receipts and revenues for oil, gas and other minerals produced and saved hereunder."

Lessors emphasize this language. They conclude that it obligates Sun to credit them with one-half the proceeds from working interest gas. Lessors contend the joint account is to be divided equally after deducting the specified expenses. Since all oil and gas revenues are reflected in this joint account, lessors conclude one-half the proceeds from working interest gas is due them.

Lessors submit Subdivision XVI also evidences the parties' intent that the entire working interest be divided equally.[2] Subdivision XVI pertains to the payment of ad valorem taxes. According to lessors, the subdivision requires them to pay one-half the ad valorem taxes on the entire working interest. Since Subdivision XVI makes no distinction between working interest oil and working interest gas, lessors submit that none was intended elsewhere in the lease.

Lessors also contend the last paragraph of Subdivision IV, as amended in 1935, confirms their interpretation of the lease. The amended paragraph reads:[3]

Lessee shall have free use of oil, gas, coal and water from said land, except water from lessors' wells, for all operations, including drilling operations, hereunder, and the royalty on oil, gas and coal and the deliveries to lessors of one-half (½) of the oil, gas and other minerals accruing to the seven-eighths (⅞ths)

the taxes accruing against the working interest shall be chargeable to the joint account provided for in Paragraph VIII hereof. Ad valorem taxes on personal property and equipment on the lease shall be borne by the parties hereto in the proportion of their ownership of same as hereinabove provided.

3. The purpose of this amendment was to clear up ambiguities in the original lease relating to Sun's free use of fuel produced from the premises.

working interest, as more particularly provided hereafter, shall be computed after deducting any so used. In lieu of using the identical fuel produced from the premises, lessee may use other fuel of no greater value and charge same against the production from the premises in accounting for both the royalty and the working interest oil, gas and other minerals deliverable to lessors hereunder; and if it is more economical to use electric or other power instead of using fuel from the premises for operations, including drilling operations, lessee may use such power and charge the cost thereof against the production from the premises . . . .

In two places the amendment refers to "deliveries to lessors of one-half (½) of all the oil, gas and other minerals accruing to the seven-eighths (⅞ths) working interest . . ." and to "accounting for both royalty, and the working interest oil, gas and other minerals deliverable to lessors hereunder . . . ." Lessors urge that this language confirms the contractual obligation of Sun to account to them for one-half the working interest gas proceeds.

Lessors further emphasize that by 1935, Sun had obtained production and submitted a division order to lessors. Although casinghead gas was being produced at this time, Sun did not have separate division orders covering oil and gas. Sun simply accounted to the lessors for one-half the entire working interest. Lessors also point out that Sun's internal records from this period reflect that the working interest in casinghead gas be divided equally between Sun and lessors. Lessors likewise point out subsequent division orders and Sun's practice, from first production until 1977, of accounting to lessors for the proceeds from one-half the working interest gas.

Sun responds that the lease is unambiguous and reserves absolutely no part of working interest gas to lessors. Sun submits that Subdivision VIII is simply a bookkeeping provision. Its main purpose is to divide the expense of producing the oil between Sun and lessors. The only mention of gas is the requirement that the joint account "reflect all receipts and revenues for oil, gas and other minerals." According to Sun, the bookkeeping requirements of Subdivision VIII and the reporting requirements of Subdivision IX operate together to provide lessors with full disclosure of all costs and revenues affecting their interests under the lease.

Sun observes that Subdivision VI is inconsistent with lessor's contention that the parties intended to divide both working interest oil and gas equally. Subdivision VI requires Sun to protect the leased premises against drainage.[4] If an oil well is brought in on adjacent property, Sun must drill an offset well. By contrast, if a gas well is brought in on adjacent land, Sun has the option to pay lessors a royalty equal to one-sixteenth of the net revenue derived from the neighboring gas well in lieu of drilling an offset well. This contrast, Sun submits, supports its contention that the parties intended to treat oil production and gas production differently.

Sun argues that its previous practice of accounting to lessors for one-half of working interest gas was a mere gratuity which Sun withdrew upon obtaining production of larger volumes of gas in 1977. Sun also explains that the references to working interest gas in the 1935 amendment were simply the result of careless drafting. Sun points out that the amendment continues

---

4. Subdivision VI, as pertinent here, provides:

In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land draining the leased premises, Lessee agrees to drill such offset well or wells as a reasonably prudent operator would drill under the same or similar circumstances, provided Lessee shall not be required to offset any such gas well on adjacent land unless the gas therefrom is marketed; pro-vided further, in lieu of drilling an offset to such gas well Lessee shall have the option of paying Lessors a royalty equal to One-Sixteenth (1/16) of the net revenue derived from the gas sold from such adjacent well, and as long as Lessee may elect to pay said royalty in lieu of drilling an offset, it will be considered that gas is being produced from the premises within the meaning of Paragraph III hereof. . . .

"... deliveries to lessors of one-half (½) of the oil, gas and other minerals accruing to the seven-eighths (⅞ths) working interest *as more particularly provided hereafter* ...." [Emphasis ours.] Lessors' participation in the working interest oil provided in Subdivision V is the only provision appearing thereafter in the lease which reserves to lessors any part of the working interest.

In addition to their difference of opinion on the proper interpretation of the contract, the parties also dispute the role of extrinsic evidence in construing an unambiguous contract. Sun argues the courts may only consider extrinsic evidence after the instrument itself is first found to be ambiguous. Lessors argue that when the construction of a contract is at issue, the court must first consult surrounding circumstances to determine whether or not the contract is ambiguous. The confusion concerning the proper rule is demonstrated by the fact that both parties rely on *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex. 1968), to support their respective contentions.

In *Pinehurst*, we found the contract to be unambiguous and wrote:

It is the general rule of the law of contracts that where an unambiguous writing has been entered into between the parties, the courts will give effect to the intention of the parties as expressed or as is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. 432 S.W.2d at 518.

Thereafter, in considering what the parties intended by the words used in the contract, we said:

Where a question relating to the construction of a contract is presented, as here, we are to take the *wording* of the instrument, *considering the same in the light of the surrounding circumstances,* and apply the pertinent rules of construction thereto and thus settle the meaning of the contract. *Id.* at 519.

 Lessors state the proper rule. Evidence of surrounding circumstances may be consulted.[5] If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. There are limits. For example, when interpreting an integrated writing, the parol evidence rule circumscribes the use of extrinsic evidence. Hence, in *Lewis v. East Texas Finance Company*, 136 Tex. 149, 146 S.W.2d 977, 980 (1941), we said:

---

5. In *Pinehurst*, we quoted with approval from the Restatement of Contracts, § 230 (1932):

The standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person *acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration,* other than oral statements by the parties of what they intended it to mean. [Emphasis added]. Professor Williston supports the same standard:

... [T]here must always be an association between words and external objects, and no matter how definite a contract may appear on its face, "words must be translated into things and facts." Thus ... the contract in any event had to be appraised in view of the surrounding circumstances known to the parties at the time of its execution and these reasonably could be looked to without violating the parol evidence rule even though the contract were not deemed ambiguous.... 4 Williston on Contracts § 609 (Third Edition, 1961).

Williston further states:

... In interpreting contracts or clauses set forth in "clear and unambiguous" language, the courts do not confine themselves to a mere inspection of the document. Before committing themselves, the courts carefully examine the surrounding circumstances, prior negotiations, and all other relevant incidents bearing on the intent of the parties.... (citations omitted)

... Only after a careful and painstaking search of all the factors shedding light on the intent of the parties, only after "turning signs and symbols into equivalent realities" will the court conclude that the language in any given case is "clear and unambiguous." (citations omitted). *Id.* at § 600A.

If a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous. It follows that parol evidence is not admissible to render a contract ambiguous, which on its face, is capable of being given a definite certain legal meaning. This rule obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction.

Although lessors urge that we examine the facts and circumstances surrounding the execution of the lease, this evidence does not aid their construction. The record demonstrates that lessors were in a strong bargaining position in 1932 because their property was adjacent to a proven oil field. W. N. Foster, who negotiated this lease for the landowners, was an attorney experienced in oil and gas. We may assume that he understood the difference in the terms oil, gas, casinghead gas and condensate. The lease bears this out, since each substance is treated distinctly. Finally, in 1932, gas was of relatively little value and there was little gas production. These facts explain why the lease devotes great detail to the working interest oil while hardly mentioning the working interest gas.

Lessors argue that an internal memorandum from Sun's files, prepared during negotiations, supports their contention that the parties intended to divide the entire working interest equally. In outlining the terms of the lease, the memorandum recites:

The owners are to execute a lease to us on our general lease form modified so as to provide for the following:

a) The lessors are to receive a ⅛th royalty.

b) All wells drilled on the property are to be drilled by us without any cost to our lessors. . . .

c) The lessors and we are each to receive ½ the working interest—namely, 43.75% of the total *oil* produced and saved.

d) Our lessors and we are each to bear ½ the cost of lifting or producing the oil, or maintenance of the wells as Mr. Foster terms it. . . . [emphasis ours]

In our view this memorandum supports Sun's contention that lessors bargained for only one-half the working interest oil.

The court of civil appeals, however, has adopted lessors' construction, holding that the lease obligates Sun to credit lessors with one-half the proceeds from working interest gas. In so holding, the court of civil appeals considered not only the wording of the lease and the circumstances surrounding its execution, but also Sun's conduct of accounting to lessors for one-half the proceeds from working interest gas over an extended period of time. The court's construction of the lease depends more upon Sun's subsequent conduct than it does upon the unambiguous language of the lease.

■ We think the court of civil appeals erred in considering this extrinsic evidence. Only where a contract is first found to be ambiguous may the courts consider the parties' interpretation. *Superior Oil Co. v. Stanolind Oil & Gas Co.*, 150 Tex. 317, 240 S.W.2d 281 (1951); *Lone Star Gas Co. v. X-Ray Gas Co.*, 139 Tex. 546, 164 S.W.2d 504 (1942). Where the meaning of the contract is plain and unambiguous, a party's construction is immaterial. *Harriss v. Ritter*, 154 Tex. 474, 279 S.W.2d 845 (1955); *Richardson v. Hart*, 143 Tex. 392, 185 S.W.2d 563 (Tex.1945).

■ Since we agree the lease is unambiguous, we shall confine our review to the lease and enforce it as written. The lease conveys a determinable fee estate in the oil, gas and minerals to the lessee, Sun. *Texas Co. v. Davis*, 113 Tex. 321, 254 S.W. 304 (1923); *Stephens County v. Mid-Kansas Oil and Gas Co.*, 112 Tex. 160, 254 S.W. 290 (1923). From this conveyance, the lessors have reserved the customary royalties and have also carved out a share in the profits from working interest oil, subject to certain specific deductions. While Subdivision VIII

clearly requires Sun to maintain books reflecting all receipts and revenues attributable to oil and gas production, it does not obligate Sun to pay any of those revenues to lessors. To find such an obligation it is necessary to look first to Subdivision IV, which sets forth the royalties to which lessors are entitled, and then to Subdivision V, which provides that Sun shall deliver one-half of the working interest oil to the credit of lessors. The lease does not reserve to lessors any share in working interest gas, nor does the lease obligate Sun to pay lessors any part of the proceeds from working interest gas. Since there is no language limiting the conveyance with respect to working interest gas, we will not assume the parties intended for lessors to participate in the proceeds from working interest gas. *Fox v. Thoreson*, 398 S.W.2d 88 (Tex. 1966).

We also reject lessors' construction of the 1935 amendment to the lease. This amendment was not intended to enlarge lessors' participation in working interest gas. Lessors' contention is that the amendment simply confirms Sun's obligation to account to them for working interest gas and does not in itself create lessors' right to working interest gas. The amendment cannot confirm an obligation which is not otherwise expressed in the lease.

In summary, the lease does not obligate Sun to account to lessors for any part of working interest gas. Since the lease is not ambiguous and does not require that Sun account to lessors for one-half the working interest gas, the court of civil appeals erred in resorting to extrinsic evidence to create such an obligation. *Universal C.I.T. Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154 (1951); *Remington Rand, Inc. v. Sugarland Industries*, 137 Tex. 405, 153 S.W.2d 477 (1941); *Lewis v. East Texas Finance Co.*, 136 Tex. 149, 146 S.W.2d 977 (1941).

In addition to their construction of the lease, lessors have urged several alternative grounds for recovery, including adverse possession,[6] estoppel, waiver and ratification. While the trial court adopted lessors' construction of the lease, it also granted lessors' Motion for Partial Summary Judgment in all things, which would include these alternative grounds. The court of civil appeals overruled all of Sun's points of error including those directed at lessors' alternative theories. We must therefore consider these alternative theories.

Lessors' alternative theories are premised on the fact that Sun shared the proceeds from working interest gas with lessors for over 40 years. During this period Sun issued division orders reflecting lessors' entitlement to one-half the working interest gas proceeds. Also important to lessors is an internal memorandum of Sun's, dated December 26, 1962. In apparent response to some question that lessors were receiving too much under the current division orders, a member of Sun's legal department advised: "[W]e have concluded to continue as heretofore, based upon our consideration of the various aspects of the matter at this time . . . ." It was not until 1977 that Sun revoked its division orders notifying lessors that they had been incorrectly credited with a share of working interest gas in the past.

Lessors argue that Sun questioned the proper construction of the lease in 1962 and that responsible officials of Sun decided to continue the previous practice of crediting lessors with a share of working interest gas. Lessors submit that this action had legal consequences which can be expressed in terms of estoppel, ratification or waiver. Lessors urge that the 1962 internal memorandum is a ratification of the parties' mutual construction of the lease or, alternatively, a waiver of Sun's rights under the lease. Likewise, Lessors argue, Sun's con-

6. Lessors argue, in the alternative, if their prior participation in the proceeds from working interest gas is classified as a true working interest, they have matured a limitations title to one-half the working interest gas. Lessors, however, candidly state that they believe their interest during this period should more proper- ly be classified a royalty interest which is a nonpossessory interest to which the rules regarding adverse possession would not apply. With this we agree, and we accordingly reject lessors alternative theory of adverse possession.

duct creates an estoppel against Sun to assert, at this late date, a construction different from the mutual construction of the parties.

 Since the lease does not require Sun to pay lessors any part of the working interest gas, lessors must view Sun's past conduct as a promise to continue paying them a share of the future proceeds from working interest gas. Estoppel, however, is a defensive theory. It does not create a contract right that does not otherwise exist. *Wheeler v. White*, 398 S.W.2d 93 (Tex. 1965); *Southland Life Insurance Co. v. Vela*, 147 Tex. 478, 217 S.W.2d 660 (1949). The damages recoverable by a party claiming estoppel are not measured by the profits that such party's reliance led him to expect, but instead are limited to the amount necessary to compensate that party for a loss already suffered. *Wheeler v. White*, cited just above; *E. F. Hutton & Co., Inc. v. Fox*, 518 S.W.2d 849 (Tex.Civ. App. Dallas 1974, writ ref'd n. r. e.). Sun's conduct in paying lessors something to which they were not entitled under their lease agreement does not create a right in lessors to continue receiving such payments in perpetuity.

The lessors' alternative theories of estoppel, ratification and waiver are an attempt to extend the estoppel effect of division orders recognized most recently by this Court in *Exxon v. Middleton*, 613 S.W.2d 240 (Tex.1981). In *Middleton*, we held that payments made and accepted pursuant to a division order are valid and binding until the division order is revoked, even though the division order modifies the express terms of the underlying lease. *Exxon v. Middleton, supra* at 250. Lessors' alternative theories require the conclusion that division orders permanently amend underlying lease provisions as a matter of law. This goes beyond our holding in *Middleton*.

The 1932 lease, as amended, does not reserve to lessors the right to participate in the proceeds from the 7/8ths working interest gas, casinghead gas or condensate. Accordingly the judgments of courts below are reversed and judgment is rendered that lessors take nothing.