**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 5, 2007**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 06-10582

BAYLOR HEALTH CARE SYSTEM;
HEALTH CARE INSURANCE COMPANY OF TEXAS LTD,
Individually and as Assignee of
Church University Insurance Company Ltd,
                                        Plaintiffs-Appellants,

versus

EMPLOYERS REINSURANCE CORPORATION,
                                        Defendant-Appellee.

Appeal from the United States District Court
For the Northern District of Texas

Before HIGGINBOTHAM, WIENER, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Plaintiff-Appellant Baylor Health Care System appeals from the district court's summary judgment dismissal of Baylor's declaratory judgment and breach of contract suit against Defendant-Appellee Employers Reinsurance Corporation ("ERC"). The court concluded that Baylor and ERC confected an accord and satisfaction of ERC's obligations under Baylor's liability policy when they agreed to fund the settlement of a tort claim against Baylor and performed according to the terms of that agreement. We reverse and remand.

I

Baylor was insured under a medical and professional liability policy issued by Church University Insurance Company, a "captive insurer," wholly owned by Baylor and insuring only the risks of Baylor and its affiliated companies.[1]  The policy provided Baylor up to $25 million of coverage, in excess of a $3.5 million self-insured retention.  ERC assumed Baylor's risk under the policy pursuant to a reinsurance certificate in which ERC agreed to (1) indemnify Baylor for all amounts above its self-insured retention paid to settle tort claims or satisfy judgments, and (2) reimburse Baylor for any defense costs attributable to losses covered by the Policy.

In April 2000, Kristi Hamilton sued Baylor in Texas state court, alleging that members of its nursing staff negligently caused her newborn son to suffer serious brain damage.  In October 2001, Hamilton and Baylor attempted to mediate their dispute.  At the mediation, Hamilton presented evidence indicating that Baylor's nurses may have been guilty of gross negligence or malice, which, if proven, could subject Baylor to punitive damages.  ERC advised Baylor that (1) the Policy did not cover punitive damages, and (2) ERC would not be responsible for any increase in the settlement value of Hamilton's claim resulting from the threat of punitive damages.  At the conclusion of the mediation, Hamilton issued a $12

---

[1] For the purposes of this opinion, payments made to or by Church will be treated as having been made to or by "Baylor" directly.  This simplification does not affect our analysis, as Church is not a party to the suit. Baylor has sued ERC both individually and as Church's assignee.

2

million settlement demand with a 48-hour deadline for acceptance.

Following the mediation, Baylor and ERC continued to discuss Hamilton's settlement offer. They agreed that Hamilton's suit presented a risk of liability well in excess of $12 million and decided to accept Hamilton's offer. ERC insisted, however, that it would not be responsible for any settlement amounts attributable to the threat of punitive damages. Recognizing that resolving this punitive damage-related dispute likely would take longer than Hamilton's settlement deadline allowed, Baylor and ERC agreed to (1) devise an arrangement which would fund a settlement of Hamilton's claims for up to $12 million, and (2) resolve their apportionment issues in a post-settlement arbitration or mock jury procedure.

ERC initially proposed that, to fund the Hamilton settlement, (1) Baylor would pay its $3.5 million self-insured retention, (2) ERC would pay the next $5 million, and (3) Baylor would pay any amount over this $8.5 million combined contribution. Then, at a later date, ERC and Baylor would "try" the Hamilton case before an arbitration panel or mock jury, which would render a verdict and award damages. The outcome of the mock trial would provide the basis for the ultimate determination of how to allocate the settlement amount between Baylor and ERC.[2] Baylor indicated its

---

[2] For example, if the mock jury awarded $10 million in compensatory damages and $5 million in punitive damages, Baylor would be responsible for one-third of the settlement amount, in excess of its self-insured retention.

general agreement with this proposal but rejected the specific apportionment methodology proposed by ERC.[3]

The next morning, Baylor's counsel sent an email message to ERC representatives containing the following provision:

> Baylor and ERC have agreed this morning (10/12) that Baylor will contribute the first $500,000 toward a settlement in excess of $8.5 million, and if settlement exceeds $10 million, Baylor will contribute the first $500,000 over $10 million. So total Baylor exposure is $1 million in excess of $3.5 SIR [self-insured retention].

> ERC will contribute all amounts towards a settlement up to $12 million, except for the Baylor SIR and $1 miilion [sic], subject to structure above. Please confirm it.

ERC's representative agreed by return email the same day, and, after some additional negotiation, the Hamilton lawsuit was settled for $10.8 million. ERC and Baylor contributed to the settlement as agreed: Baylor paid its $3.5 million self-insured retention, plus a $1 million contribution pursuant to the terms of the email agreement, and ERC paid the remaining $6.3 million. ERC also reimbursed Baylor 58.3% of its defense costs, a share proportional to its contribution to the total settlement amount.

Baylor later requested that ERC reimburse Baylor both the $1 million it contributed above its self-insured retention, and the

---

[3] Baylor's counsel expressed his reservations about the mock trial proposal in an email to an ERC claims supervisor:

> ERC's interest is inflaming the fact finder here and our interest is to show what the actual damages are. We should be trying to resolve the dispute in question, not to see how bad ERC can make Baylor look.

4

defense costs attributable to that additional contribution.  ERC refused, and Baylor filed suit in Texas state court for declaratory judgment and breach of contract.  ERC removed the case to the district court, and both parties eventually filed motions for summary judgment.  The court granted ERC's motion, holding that the parties' execution and performance of the Agreement amounted to an accord and satisfaction of any obligation ERC had under the Policy. Baylor appealed.

## II

### A

This court reviews the district court's grant of summary judgment de novo.[4]  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[5]  In determining whether there is a genuine issue of material fact, all facts must be evaluated in the light most favorable to the non-moving party.[6]

### B

Under Texas law, "[a]ccord and satisfaction, as a defense to

---

[4] Twin City Fire Ins. Co. v. City of Madison, 309 F.3d 901, 904 (5th Cir.2002).

[5] Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[6] See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

5

a claim based upon a contract, exists when the parties have entered into a new contract, express or implied, which discharges the obligations under the original contract in a manner otherwise than as originally agreed."[7]  The "accord" is the new contract in which the parties mutually agree that one party will give and the other will accept something that is different from what each expected from the old contract.[8]  The "satisfaction" is the actual performance of the new agreement.[9]  Any claim arising out of a contract may be the subject matter of an accord and satisfaction, provided the contract is not illegal.[10]

A valid accord and satisfaction requires more than the mere payment or acceptance of money.[11]  There must be an "unmistakable communication" establishing that performance according to the terms of the new agreement will satisfy the underlying obligation created by the original contract.[12]  Such communication "must be plain, definite, certain, clear, full, explicit, not susceptible of any

---

[7] Womco, Inc. v. Navistar Int'l Corp., 84 S.W.3d 272, 280 (Tex. App.-Tyler 2002, no pet.)(citing Harris v. Rowe, 593 S.W.2d 303, 306 (Tex.1979)).

[8] Id.

[9] Id. (citations omitted).

[10] Ostrow v. United Bus. Mach., Inc., 982 S.W.2d 101, 104 (Tex. App.-Houston [1 Dist.],1998, no pet.)(citations omitted).

[11] See Pate v. McClain, 769 S.W.2d 356, 362 (Tex. App.-Beaumont 1989, writ denied)("There should be a statement that accompanies the tender of the lesser sum, which statement also must be so clear and so explicit and so complete that the statement is simply not susceptible of any other interpretation but one of complete accord and complete satisfaction.").

[12] Id. at 361-62(citations omitted).

other interpretation, and accompanied by acts and declarations that [the parties are] sure to understand."[13]  Nevertheless, the new agreement need not explicitly state that it is intended to supersede the original contract.[14]  Rather, courts may look to the circumstances surrounding the execution of the new agreement to determine if there has been an agreement to discharge the original obligation.[15]  When the parties' intent is "resting in implication," however, the circumstantial evidence must "irresistibly point to the conclusion" that, in reaching a new agreement, the parties assented to a complete discharge of the original obligation.

The question presented in this case is whether the agreement comprised an "unmistakable communication" that it was intended to effect a complete discharge of all of ERC's obligations under the Policy, or whether the circumstances surrounding the execution of the agreement "irresistibly point" to the conclusion that the parties assented to a complete discharge of ERC's obligations under the Policy.

As noted above, the entirety of the Agreement is set forth in the following email communication from Baylor to ERC:

> Baylor and ERC have agreed this morning (10/12) that Baylor will contribute the first $500,000 toward a settlement in excess of $8.5 million, and if settlement exceeds $10 million, Baylor will contribute the first

---

[13] Id.

[14] Womco, 84 S.W.3d 272 at 280.

[15] Id. (citations omitted).

7

> $500,000 over $10 million. So total Baylor exposure is
> $1 million in excess of $3.5 SIR [self-insured
> retention].
>
> ERC will contribute all amounts towards a settlement
> up to $12 million, except for the Baylor SIR and
> $1 miilion [sic], subject to structure above.
> Please confirm it.

In its summary judgment ruling, the district court reasoned that, because the email communication between ERC and Baylor was "a classic offer and acceptance, forming a contract," and because ERC "tendered a conforming check, which [Baylor] accepted," then "[t]he elements of accord and satisfaction are thus present."

The court made no threshold inquiry whether the agreement unequivocally manifested the parties' intent to discharge their obligations under the policy. In rejecting Baylor's contention that it had confected only an interim settlement-financing agreement, the court determined that the agreement was "a straightforward allocation of settlement responsibility" and ERC's performance constituted a "full satisfaction" of its obligation for the Hamilton settlement under the policy. Specifically, the court pointed to the agreement's provision that "total Baylor exposure is $1 million in excess of $3.5 [self-insured retention]" as a clear indication that the agreement was intended to be a final determination of the parties' financial responsibilies for the Hamilton settlement. The court concluded that "the express agreement in the October 12 email contract, in conjunction with the close proximity in which ERC's conforming payment was tendered,

8

provide sufficient context for acceptance of that check to constitute satisfaction."

Baylor urges instead that the agreement does not contain an unmistakable communication intended to effect a complete discharge of ERC's obligations under the policy. It argues that the term "total exposure" refers not to the ultimate allocation between Baylor and the reinsured, but to the exposure to plaintiff's demands.

We agree that this interpretation seems plausible. The agreement makes no reference to the policy or any policy-related dispute, and is completely silent regarding the effect of the agreement on the parties' existing obligations under the policy. The district court erred in concluding that the agreement's references to "settlement contributions" and "exposure" convert this silence into unambiguous assent to a complete discharge of ERC's liability under the policy.

Nor do the circumstances surrounding the parties's execution of the agreement "irresistibly point" to the parties' assent to a complete discharge of ERC's liability under the policy. Instead the circumstances might also suggest, as Baylor urges, that the agreement was only an interim settlement-financing agreement. There is summary judgment evidence indicating that (1) none of the parties' representatives ever discussed discharging ERC's obligations under the policy, (2) the parties' representatives did

9

discuss resolving the punitive damages-related dispute *after* settling the Hamilton suit, (3) the parties agreed to resolve their dispute after settling the Hamilton suit, but could not agree on a methodology, and (4) Baylor intended the agreement only to establish how to fund the settlement.

We are persuaded that viewing this evidence in the light most favorable to Baylor, summary judgment dismissal was not warranted. Baylor's post-settlement demand for additional reimbursement from ERC, and ERC's subsequent agreement to pay a portion of Baylor's defense costs —— an obligation it assumed under the policy —— might indeed indicate both parties' recognition that the policy provisions remained in effect, even after the purported accord and satisfaction.

ERC acknowledges that in a typical accord-and-satisfaction case the offeror must prove that the agreement comprises an "unmistakable communication" of the intent to discharge a prior obligation, but argues that this case is atypical because it involves a written agreement, not simply the tender of a payment. ERC maintains that the law's requirement that an accord and satisfaction involve a clear communication of the parties' mutual assent to the complete discharge of obligations created by the original contract was intended to protect creditors from being "tricked" into surrendering all of their rights by accepting what they believe to be partial payment of a debt owed. Here attorneys

10

created the alleged accord in an exchange of emails, so ERC insists that this case does not implicate the creditor-protection concerns that traditionally prompt courts to require that, to confect an accord and satisfaction, parties must agree to a discharge of existing obligations in terms that are "plain, definite, certain, clear, full, explicit, not susceptible of any other interpretation, and accompanied by acts and declarations that [the parties are] sure to understand."[16] Consequently, ERC asks this court to ignore the stringent language of accord-and-satisfaction cases and look only to "the law governing express contracts." And under contract law, ERC reminds us, any ambiguity should be construed against Baylor.

ERC errs in suggesting that the law of accord and satisfaction is independent of the law of contract.[17] Indeed, "[t]he process of making an accord, of interpreting the words and acts of the parties, and of determining the legal effect thereof, is the same as in the case of other contracts. . . . There must be accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand,

---

[16]*Christian v. University Federal Savings Association*, 792 S.W.2d 533, 534 (Tex.App.–Houston [1st Dist.] 1990, no writ); *see also Jenkins v. Henry C. Beck Company*, 449 S.W.2d 454, 455 (Tex.1970).

[17]In *Jenkins v. Henry C. Beck Co.*, the Texas Supreme Court explained that the defense of accord and satisfaction "rests upon a new contract, express or implied, in which the parties agree to the discharge of the existing obligation by means of the lesser payment tendered and accepted." 449 S.W.2d 454, 455 (Tex. 1970).

that the performance is offered to him as full satisfaction of his claim and not otherwise."[18]  As in usual contract disputes, "It is wholly a question of intention, to be determined by the usual processes of interpretation, implication, and construction."[19]

To the extent that accord-and-satisfaction cases seem to demand a higher standard of proof, the stringent rules they described are only particular instances of a general rule: the primary concern in a contract case is to ascertain the true intent of the parties as expressed in the instrument, and a court may examine the underlying circumstances as an aid in construing the contract's language.[20]  In light of the circumstances under which most accord-and-satisfaction defenses arise — a debtor claiming discharge of a prior obligation based on partial payment — courts are understandably suspicious of ambiguity.

Here too we consider the underlying circumstances as a guide to contract meaning.  Both parties acknowledge that at the time the agreement was reached there was a need to fund the Hamilton settlement quickly, and a dispute as to what percentage of that settlement was attributable to the threat of punitive damages, and therefore not recoverable from ERC.  The parties also acknowledge agreeing to first fund the settlement in principle and to later

---

[18]6 Corbin on Contracts, § 1277 at 117–18 (1962).

[19]Id.

[20]Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex. 1981).

allocate their respective liability for sharing the settlement amount. In light of these facts, Baylor's contention that the agreement was only an interim financing agreement is plausible, yet the district court ruled that the agreement was intended to finally allocate settlement responsibility because (1) the use of the term "exposure," which, according to the court, "connotes the maximum amount a party considers itself liable to be required to pay," and (2) the absence of any reference in the agreement to "temporary funding, or of amounts to be determined at a later date."

That's a lot to decide on summary judgment without the benefit of oral argument. In context, there were two "exposures" and the term "total exposure" might have referred to either the exposure to plaintiff's demands or to the ultimate allocation between Baylor and the reinsured. And although we agree with the able District Judge that the absence of any reference to temporary funding or post-settlement proceedings suggests the parties' intent to resolve conclusively their respective liability for the Hamilton settlement, we are not persuaded that this silence is sufficient support for the requisite finding of an "unmistakable communication" of the parties' intent to discharge ERC's obligations under the policy. Baylor presented circumstantial evidence that the agreement may have been intended only as a stop-

13

gap settlement-financing agreement.[21]  Indeed, none disputes that in considering the Hamilton settlement the parties agreed in principle to execute an interim funding agreement to be followed by a subsequent determination of final responsibility.  Although the parties never finalized any such arrangement, there is no evidence establishing whether the parties, in executing the agreement, abandoned this approach altogether.

Viewing all of the evidence in the light most favorable to Baylor, a material fact issue exists whether there was an accord and satisfaction.  With the summary judgment evidence, particularly the agreement's silence as to its effect on the parties' obligations under the policy, We think this case is best resolved by settlement or trial.

### III

ERC also moved for summary judgment on the affirmative defense of equitable estoppel, which the district court did not reach but

---

[21]This is not to say that ERC will not present a strong case at trial. They argue, for example, that Baylor did not need a written agreement to secure interim financing of the settlement, but could have funded the settlement itself and later demanded reimbursement from ERC under the policy.  ERC also suggests that the stepped-increase structure of the agreement, which had not been part of earlier settlement-financing proposals, "would hardly be necessary if the parties had intended [to arrange] only interim funding."  Finally, ERC contends that Baylor's rejection of ERC's proposed mechanism for resolving the settlement liability dispute lends support to the district court's conclusion that the agreement was not simply an alternative mechanism for funding a settlement, but was an "abandon[ment of] the interim funding/dispute resolution approach altogether" in favor of a final disposition of the parties' proportional financial responsibility for any settlement.  All this proves, to our eyes, is that this case is best not resolved on summary judgment.

14

which is properly before us.[22]  In general terms, the doctrine of equitable estoppel requires that "one who retains benefits under a transaction cannot avoid its obligations and is estopped to take an position inconsistent therewith."[23]  The doctrine responds to the unfairness of parties enjoying the benefits of a contract and subsequently seeking to avoid the obligations created by that contract.[24]  ERC contends that Baylor, having enjoyed the benefit of the agreement, settlement of the Hamilton lawsuit, should be estopped from demanding any additional indemnification from ERC under the policy.

This begs the question.  Equitable estoppel has no independent role to play here as it applies only if we accept ERC's construction of the agreement as an accord in complete discharge of ERC liability under the policy.  Under Baylor's proferred construction of the agreement as an interim financing agreement, Baylor's demand for further indemnification is not at all inconsistent with acceptance of ERC's settlement payment.

The judgment of the district court is REVERSED and the case is REMANDED for trial.

---

[22] In re ADM/Growmark River System, Inc., 234 F.3d 881, 886 (5th Cir. 2000).

[23] Long v. Turner, 134 F.3d 312, 318 (5th Cir. 1998)(quoting Theriot v. Smith, 263 S.W.2d 181, 183 (Tex. Civ. App.-Waco 1953, writ dism'd)).

[24] Id.