Chief Justice JEFFERSON,
joined by Justice WILLETT and Justice LEHRMANN, dissenting.
The Court holds that language manifestly stricken from a contract, and thereby made inoperative by the parties, nonetheless determines the contract’s meaning. The Court believes that industry custom controls and that our precedent demands this outcome. But there is no evidence of such a custom, and old precedent, to the extent that it employs inoperative language to interpret a contract, is overwhelmed by modern views of parol evidence. I respectfully dissent.
I. Deleted Language
Based on what it believes to be the custom of the Lloyd’s market,[1] the Court engages in a speculative analysis of what the parties to this insurance contract intended when they deleted certain contractual language. In doing so, the Court enters a morass of indeterminacy, which could easily be avoided by focusing on the contract language alone. To justify looking to the contract’s deleted language, the Court relies on two cases that are, in my opinion, ill-reasoned, and should be disapproved to the extent that they consider deleted text to interpret a facially unambiguous contract.
The content of a deleted provision, like the negotiations preceding the contract’s execution, is extrinsic and cannot be considered in interpreting the contract. In Sun Oil Co. v. Madeley, 626 S.W.2d 726, 731 (Tex.1981), we made clear that while a court may consider the circumstances surrounding a contract’s execution, it could do so only as an aid to the interpretation of the contract’s language. Neither surrounding circumstances nor extrinsic evidence may be consulted if they introduce ambiguity, as consideration of paragraph 13 does here. Sun Oil Co., 626 S.W.2d at 732 (“[P]arol evidence is not admissible to render a contract ambiguous .... ” (quoting Lewis v. E. Tex. Fin. Co., 136 Tex. 149, 146 S.W.2d 977, 980 (1941))). Extrinsic evidence, moreover, may be considered only when the contract’s meaning cannot be determined from the text. See Nat’l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 521 (Tex.1995) (holding that extrinsic evidence may not be introduced where the contract is unambiguous); Sun Oil Co., 626 S.W.2d at 732 (same). The circumstances that a court may consider are limited to the facts constituting the context of the contract’s execution, not extrinsic evidence of the negotiations among the parties. Professor Williston explains that the rule permitting consideration of surrounding circumstances should not be read to eviscerate the parol evidence rule by allowing extrinsic evidence; rather, surrounding circumstance “refers to the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties” — factors such as the parties’ experience, sophistication, and age.[2] 11 Richard A. Lord, Williston on *475 Contracts § 32.7 (4th ed.1999). To consider deleted language or other previous drafts or negotiations would destroy the parol evidence rule without easing interpretation. See id. § 33.42 (noting that “the law distinguishes [facts regarding pri- or negotiations] from other facts surrounding the transactions” and that “evidence of [facts regarding prior negotiations] is inadmissible”). Indeed, Texas law prohibits as extrinsic evidence the introduction of prior policies and negotiations, as well as legal memoranda, for the purpose of aiding the interpretation of an unambiguous contract. See, e.g., Fiess v. State Farm Lloyds, 202 S.W.3d 744, 747 (Tex.2006) (prior policies); Nat’l Union Fire Ins. Co., 907 S.W.2d at 521 (prior dealings; prior negotiations); Sun Oil Co., 626 S.W.2d at 732 (legal memoranda); of. Sharp v. State Farm Fire & Cas. Ins. Co., 115 F.3d 1258, 1262 (5th Cir.1997) (interpreting Texas law and prohibiting prior policies).
The evidence that Wellington wishes to admit does not provide context for the negotiation and execution of the contract in a way that elaborates on the meaning of the contract’s language; rather, Wellington seeks to use language the parties rejected to tell us directly what the contract means. Cf. Fiess, 202 S.W.3d at 745 (noting that we construe contracts according to what they say, “not what ... insurers thought [they] said”). Paragraph 13 is not evidence of a surrounding circumstance; it is parol evidence, and the Court gives no reason, beyond two old cases that conflict with the spirit of our recent precedent, for why it should be considered here.
When contracting parties strike through proposed language, the stricken language is inoperative. Though the deleted text is legible, we must not summon dead words for live contracts. See 11 Lord, Williston on Contracts § 32:13 (noting that deletions “manifest!] an unwillingness to be bound according to the deleted terms”). Deleted language is extrinsic to the contract, valid only where the law otherwise permits its consideration. Most other courts considering this issue have reached this conclusion. See, e.g., Gateway Frontier Props., Inc. v. Seiner, Glaser, Komen, Berger & Galganski, P.C., 974 S.W.2d 566, 570 (Mo.Ct.App.1998) (noting that the majority of “jurisdictions considering the issue have held that stricken language is extrinsic and may not be resorted to in construing an integrated, unambiguous contract”). In one of the earliest opinions to address the effect of deleted language on contract interpretation, the Supreme Court of South Carolina wrote:
[W]e think the notes must be read as if the words erased had never been inserted, and when so read the contract falls within the general rule as to mortgages. Those words were not at all necessary to create a liability on the part of the defendant ..., and if he had desired to exempt himself from such liability he should have inserted in the contracts words of exemption, as contracts must be construed by the words which they contain, and not with reference to words omitted or erased.
Straub v. Screven, 19 S.C. 445, 449-50 (1883).[3]
*476 The opposite rule creates havoc. Imagine that an insurance company provided insurance through a form policy with the various types of coverage negotiable before execution. Two parties contract for identical coverage with this insurer, but one is provided a clean copy, containing only the language to which that party agreed. The other, meanwhile, receives a policy with the same operative language but with other language — coverage not contracted for — crossed out. Under the regime proposed by Wellington, were both parties to sue on the contract, the interpretations might come out differently, even though each had negotiated the same coverage, because the court in one case could look to the deleted language while the other could not. Such a rule would invite confusion rather than mitigate it.[4]
Meaning derived from stricken language can never be more than a mere inference — a reading of intent into an action without clear meaning — and thus the Court substitutes guesswork for operative language. The Court believes the words were deleted because the parties rejected their substance. I disagree, as explained below. But even if the Court were right in this case, the intent behind deletions will not always — or even usually — be so clear. Parties delete language because of “an unwillingness to be bound according to the deleted terms.” 11 Lord, Williston on Contracts § 32.13. Why they were unwilling to be bound by those terms — or even whether the parties wished not to be bound by them for the same reason[5] — is not apparent. See id. (noting that deletions “may not express to what terms a party would be willing to be bound”). Deletions may serve some purpose, but we should reject the notion that that purpose is easily ascertainable simply from the contract’s face and the fact of deletion. Courts cannot hope to do this consistently and successfully, and they should not try.
II. The Contract’s Language
The contract must be interpreted without reference to the deleted paragraph 13, and coverage for standby charges is otherwise established by the contract’s language.
When the deletion is honored as a banishment, there is only one reference to standby charges; a clause stating a deductible for standby charges. Surplusage being strongly disfavored in the interpretation of contracts, this alone is strong evidence of coverage. If standby charges were not covered, what would be the rationale for including the deductible? It is “our duty ... to give effect to all contract *477 provisions, and render none meaningless.” King v. Dall. Fire Ins. Co., 85 S.W.3d 185, 193 (Tex.2002). Yet the Court dismisses the deductible language and holds it “inoperative.”[6] 352 S.W.3d at 473. Holding that standby charges are indeed covered would, consistent with our precedent and in contrast with the Court’s construction, give meaning to each of the contract’s provisions, rendering none meaningless.
Coverage becomes more clear when the deductible provision is considered alongside the contract’s other provisions. Paragraph l.a. of the Basis of Recovery section promises indemnification for “installation and all other costs necessarily incurred and duly justified in repair or replacement.” Paragraph l.d. of the Basis of Recovery section provides that in the event of a loss caused by a covered occurrence, with respect to
repairs ... carried out by vessels ... which the Assured have on charter, ... the cost or the proportion thereof shall be based on the pre-agreed hire or contract rates for such employment when used in or about the repair ... and shall be so recoverable as a claim hereon. In the event that the Assured utilizes its own vessels ... for any repair, ... a reasonable charge in respect of such work shall be recoverable as a claim hereon.
These clauses provide coverage for weather standby charges. Paragraph l.a. does not, by its terms, restrict coverage to actual repair costs. Rather, the provision covers all costs that are “necessarily incurred and duly justified” in the course of repairs, even if those costs are not for actual repairs. Here, Houston and Offshore incurred the weather standby costs in the course of the repairs. Though the immediate cause of the charges was the weather, it is apparent that they were in fact incurred as a result of the covered occurrence — the vessels put on standby were hired to perform covered repairs, but the weather intervened. These vessels, while on standby, continued to be hired for the purposes of repair. Absent clearer exclusionary language in the contract, the standby charges are necessarily incurred and duly justified.
Paragraph l.d. supports this conclusion. It has two relevant clauses. The first deals with hired vessels “used in or about the repair.” Wellington narrowly defines the term “about” and argues that this provision restricts indemnification to costs associated with the use of the vessels while *478 they are actually engaged in repairs or are physically near the repair site. This misinterprets the contract’s use of the term “about.” The Oxford English Dictionary makes clear that, when used as a preposition, “about” may express proximity, but it may also express “relation or connection.” Oxford Eng. Dictionary (online ed.2011), http://www.oed.com (all Internet material as visited August 23, 2011, and copy available in Clerk of Court’s case file). This reading makes sense: it is more reasonable for Wellington to indemnify the Assureds for hiring costs incurred “in or in connection with” a repair than for costs incurred “in or near” a repair.
The second clause of paragraph l.d. indemnifies the Assureds for hire costs related to boats owned by the Assured and “utilise[d] ... for” repairs. Because most of the standby charges at issue are related to vessels owned by Offshore, this provision is especially relevant. As with the previous clause, the contract’s language here does not limit indemnification to the vessel’s expenses while actually engaged in repairs. Crucially, the preposition changes from the previous sentence. There, the parties wrote “used in” — implying actual repairs costs — while here it is “utilized for.” Like “about,” the use of “for” broadens the coverage, indicating that indemnification should include costs incurred with regard to those vessels while they are generally engaged in repair-related activities, even if they are not actively making repairs. Here, Offshore’s vessels were being “utilise[d] ... for” repairs to the platform when the storms forced them to quit. While the storms passed, Offshore and Houston kept those vessels on standby, ensuring their continued availability when repairs could recommence. As such, even as they waited out the storms, the vessels continued to be used for the repairs. Indeed, waiting on standby was their use, meant to ensure that repairs continued with haste.
Thus, standby charges are covered under the contract.
III. Conclusion
The Lloyd’s process is odd and opaque. Even after extensive discovery, it remains unclear how the insurance contract came into being or to what extent its language was accepted by the parties. Taking into account language that was removed from a contract, and trying to read the record of the negotiations, only confuses things. Here, there is a deletion and a failure to delete; there are changed stories; there are conflicting explanations. This is not clear evidence of noncoverage because it is clear evidence of nothing. Considering this extraneous information inhibits rather than enhances clarity, and it makes our interpretive task more difficult. The Court should not have gone down this road in Gibson or Dwyer, and the Court should not compound its mistake today.
We interpret language, not its absence. The expressive content of an act of deletion will frequently be indeterminate; here, it could have been intended to remove coverage, remove redundancy, or remove a sublimit. Deleted language is therefore best regarded as extrinsic evidence, inadmissible for the purposes of varying or contradicting the language of an unambiguous contract. Accordingly, I respectfully dissent.

. See 352 S.W.3d at 464 ("Coverage was negotiated in the London market, and as is customary there, the parties reached agreement by lining through provisions in a form policy.”). The Court cites no authorities confirming the existence of such a custom. Elsewhere, the Court states a broader rule: that "deletions in a printed form agreement must be considered in construing the other provisions." Id. at 471 (emphasis added).

. We have tended to permit evidence only of such contextual facts under the rubric of "surrounding circumstances.” See, e.g., Progressive Cnty. Mut. Ins. Co. v. Kelley, 284 S.W.3d 805, 807-08 (Tex.2009) (considering *475 the existence of two contracts — not their content — as part of the "surrounding circumstances”); Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741-42 (Tex.1998) (regulatory climate surrounding promulgation of a form policy); Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455, 457-58 (Tex.1997) (the fact that the insurance was provided to a sole shareholder corporation); Sun Oil Co., 626 S.W.2d at 732 (bargaining position, sophistication, and relative value of the minerals at the time of execution).

. See also, e.g., Hughes v. Samedan Oil Corp., 166 F.2d 871, 873-74 (10th Cir.1948) (noting that a court may only look to a deleted provi *476 sion where the contract is ambiguous); St. Lawrence Explosives Corp. v. Worthy Bros. Pipeline Corp., 916 F.Supp. 187, 190-91 (N.D.N.Y.1996) (same), aff'd, 111 F.3d 124 (2d Cir.1997) (unpublished table decision); Remillard Brick Co. v. Remillard-Dandini Co., 51 Cal.App.2d 744, 125 P.2d 548, 552 (1942) (refusing to look at an excised provision because the contract, considered without reference to that provision, was unambiguous); Kennon v. Shepard, 236 Mass. 57, 127 N.E. 426, 427 (1920) (''[W]ords eliminated from the contract before its execution cannot be restored; and they cannot be used in its construction."); Gateway Frontier Props., Inc., 974 S.W.2d at 570 ("The rationale underlying the rule is that the writing excised from the agreement ... is not part of the agreement between the parties.”).

. Similarly, the Court's rule would give significance to seemingly insignificant factors, such as the thickness of the line striking a provision; Would deleted language be considered where struck with a thin, pen line but not where struck emphatically with marker that rendered the provision illegible? If the same rule would apply to both situations, how would parties prove what the now-illegible text said?

. And in this case, it is clear that there was no agreement at all.

. Although the Court is nonchalant about calling actual provisions surplusage, the Court is deeply concerned about hypothetical surplusage. The Court writes that the contract cannot be read to cover standby charges — because of the (non?)existence of paragraph 13: "If paragraph Id covered weather standby charges, paragraph 13 would be surplusage in a policy in which it was not struck through.” 352 S.W.3d at 473. This amounts to the conceptually difficult argument that something cannot be covered because if language not actually in the contract were in the contract, that language not in the contract would be surplusage. But paragraph 13 is not in the contract, and so the Court rejects the only reading that gives meaning to each of the contract’s clauses based on its hypothetical interpretation of a contract that is not before this Court and, indeed, may not exist. And, moreover, this is all based on a belief, implicit in the Court's reasoning, that the form contract from which the Underwriters were working could not have contained surplusage as it was written — but perhaps it did, and perhaps that’s why the "surplusage” was removed?
Or perhaps paragraph 13's deletion removed a sublimit, as the brokers argued to the Underwriters. To this the Court again says no, writing that "the way to delete the [sublimit] was to strike the introductory phrase” rather than the whole paragraph. 352 S.W.3d at 472 (emphasis added). The way: in the Court's opinion, there could be no other way to remove a sublimit.