EOG RESOURCES, INC., Appellant,

v.

KILLAM OIL CO., LTD. and Hurd Enterprises, Ltd., Appellees.

No. 04–06–00794–CV.

Court of Appeals of Texas, San Antonio.

Aug. 8, 2007.

Rehearing Overruled Sept. 27, 2007.

Frank E. Weathered, Dunn, Weathered, Coffey, Rivera, Kasperitis & Rodriguez, P.C., Marshall Boykin, III, Wood, Boykin & Wolter, P.C., Corpus Christi, for appellant.

Dan Miller, John M. Quinlan, McElroy, Sullivan & Miller, L.L.P., Austin, V.E. Lanfear, Jr., San Antonio, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice KAREN ANGELINI, Justice SANDEE BRYAN MARION, Justice.

## OPINION

SANDEE BRYAN MARION, Justice.

This is an appeal from a summary judgment rendered in favor of appellees. We affirm.

## BACKGROUND

In this oil and gas case, the dispute centers on the interpretation of various agreements entered into between the parties' predecessors. Killam & Hurd, Ltd., predecessor-in-title to Killam Oil Co., Ltd. and Hurd Enterprises, Ltd. (collectively, "Killam"), are the named lessees in three oil and gas leases located in Webb County, Texas. The leases are designated in the various documents as Lease "A," Lease "B," and Lease "C." In October 1974, Killam and Northern Natural Gas Company[1] ("NNG") entered into a farmout agreement ("the NNG Farmout Agreement"), pursuant to which Killam agreed, if certain conditions were first satisfied, to execute in favor of NNG three assignments of a portion of the working interests in certain zones ("the InterNorth zones") under the three leases. In 1981, NNG's successor-in-interest, InterNorth, Inc., expressed an interest in selling its interests in the InterNorth zones. In December 1982, HNG acquired InterNorth, Inc.'s interests in the InterNorth zones and then assigned fifty percent of those interests to Killam. Although commercial production was initially obtained from the InterNorth zones under the NNG Farmout Agreement, production terminated between July 1994 and March 1998.

In April 1978, Killam and HNG Oil Company[2] ("HNG") entered into a farmout agreement ("the HNG Farmout Agreement"), pursuant to which Killam agreed to farmout certain zones covered by the same three leases ("the HNG zones"), but as to depths deeper than the InterNorth zones. The wells drilled under the HNG Farmout Agreement were operated pursuant to the terms of a November 20, 1978 Operating Agreement ("the 1978 OA"). Attached to the 1978 OA was an Exhibit A, which reflected the parties' interests in the HNG zones.

---

1. NNG is EOG's predecessor-in-interest.

2. HNG is also EOG's predecessor-in-interest.

In April 1983, HNG and Killam executed a Letter Agreement ("the 1983 Letter Agreement") for the purpose of combining the drilling and production operations in the HNG zones and the InterNorth zones under the 1978 OA. Attached to the 1983 Letter Agreement was an amended Exhibit A, which reflected the parties' interests in the HNG zones and the InterNorth zones. Ultimately, Enron Oil & Gas succeeded to HNG's interests, and EOG Resources, Inc. ("EOG") succeeded to Enron's interests.

Killam brought suit against EOG claiming that pursuant to the NNG Farmout Agreement, EOG lost record title in the InterNorth zones as a result of non-production from those zones beginning in 1994. EOG counterclaimed for a judgment declaring it had rights to production from the InterNorth zones for so long as the 1978 OA remained operative. The parties filed cross-motions for partial summary judgment.[3] The trial court denied EOG's motion and granted Killam's motion. Following trial on the issue of attorney's fees, the trial court rendered final judgment in favor of Killam. EOG now appeals.

## RIGHTS TO PRODUCTION IN THE INTERNORTH ZONES

In its summary judgment motion, Killam argued that both the NNG Farmout Agreement and the assignments made pursuant to the agreement terminated when production in the InterNorth zones ceased in 1994, resulting in EOG's loss of its right to production from the InterNorth zones.[4] Killam asserts the parties amended Exhibit A for the sole purpose of making the 1978 OA applicable to all operations in both the InterNorth zones and the HNG zones, and, pursuant to the 1983 Letter Agreement, it did not waive reversionary rights under the NNG Farmout Agreement. Thus, according to Killam, the failure of title provision contained in the 1978 OA operates to reduce EOG's interest in production from the InterNorth zones. Killam also asserts neither the 1983 Letter Agreement nor the amended Exhibit A changed this result.

EOG, on the other hand, argues that failure of title is irrelevant because it is still entitled to production from the InterNorth zones so long as the 1978 OA, as amended by Exhibit A, is operative. EOG contends the parties amended Exhibit A for two purposes: (1) to merge HNG's and Killam's interests under one operating agreement (the 1978 OA) and (2) to prevent loss of title in the shallower InterNorth zones pending joint development of the deeper HNG zones. EOG contends the amended Exhibit A accomplished the second goal by allocating to EOG a contractual right to share in production from the InterNorth zones, regardless of the terms of the original NNG Farmout Agreement, so long as the 1978 OA was in force due to development of other zones. Thus, according to EOG, the 1978 OA entitles EOG to a share of production as long as there is production from any party from any location within the area governed by the parties' agreement. In support of its argument, EOG urges this court to consider the facts and circumstances surrounding the execution of the 1978 OA, the 1983 Letter Agreement, and the amended Exhibit A.[5]

---

3. Attorney's fees were not addressed in the cross-motions.

4. The underlying litigation centers on EOG's interest in the InterNorth zones located on Leases B and C. No other zones are in dispute.

5. For example, EOG contends a cooperative effort to jointly develop the property had several advantages: (1) it avoided having to drill

■ In construing the agreements at issue here, we seek the parties' intention as that intention is expressed in the agreements. *See Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 727–28 (Tex.1981). We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and we avoid when possible a construction that is unreasonable, inequitable, and oppressive. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex.1987). An unambiguous instrument will be enforced as written, and ordinarily the writing alone will be deemed to express the parties' intentions. *Sun Oil Co.*, 626 S.W.2d at 728. Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered into. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996); *Sun Oil Co.*, 626 S.W.2d at 731. If a written contract is worded in a manner that allows it to be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous. *See Sun Oil Co.*, 626 S.W.2d at 732. Therefore, parol evidence is not admissible to render a contract ambiguous, which on its face, is capable of being given a definite certain legal meaning. *Id.* "This rule obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction." *Id.* Thus, "[c]onsideration of the facts and circumstances surrounding the execution of a contract … is simply an aid in the construction of the contract's language." *Id.* For the reasons stated below, we do not believe that examination of the facts and circumstances surrounding the execution of the documents at issue here aids EOG's interpretation.

■ An operating agreement "is a contract typical to the oil and gas industry whose function is to designate an 'operator, describe the scope of the operator's authority, provide for the allocation of costs and production among the parties to the agreement, and provide for recourse among the parties if one or more default in their obligations.'" *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 344 n. 1 (Tex.2006). Here, the 1978 OA provides that its term lasts "[s]o long as any of the oil and gas leases subject to this agreement remain or are continued in force as to any part of the Contract Area, whether by production, extension, renewal or otherwise, and/or so long as oil and/or gas production continues from any lease or oil and gas interest." "Contract Area" is defined as "all of the lands, oil and gas leasehold interests and oil and gas interests intended to be developed and operated for oil and gas purposes under this agreement. Such lands, oil and gas leasehold interests and oil and gas interests are described in Exhibit 'A.'" With regard to Exhibit A, Article III of the 1978 OA states as follows:

B. Interest of Parties in Costs and Production:

separate wells to the formations encountered in each separate interval; (2) it enabled the parties to delay production in one or more intervals in order to take advantage of market forces then in existence; and (3) it enabled production from deeper formations first, thereafter, allowing the parties to progressive-ly go "up hole" to exploit shallower formations and/or reserves behind pipe. EOG asserts that, given these advantages, it made sense for the parties to protect interests in the shallower InterNorth zones from loss due to non-production by making those interests contractually co-extensive with the 1978 OA.

*Exhibit "A" lists all the parties and their respective percentage or fractional interests under this agreement.* Unless changed by some other provisions, all costs and liabilities incurred in operations under this agreement shall be borne and paid, and all equipment and material acquired in operations on the Contract Area shall be owned by the parties as their interests are shown in Exhibit "A." *All production of oil and gas from the Contract Area,* subject to payment of lessor's royalties, which will be borne by the Joint Account, *shall also be owned by the parties in the same manner* during the term hereof; provided, however, this shall not be deemed an assignment or cross-assignment of interests covered hereby. [Emphasis added.]

Thus, the 1978 OA unambiguously provides that each party's share of production is based on that party's respective percentage or fractional interest. Article IV of the 1978 OA addresses the consequences of loss of title to those interests:

B. Loss of Title

1. Failure of Title: *Should any oil and gas interest or lease, or interest therein, be lost through failure of title, which loss results in a reduction of interest from that shown on Exhibit "A",* this agreement, nevertheless, shall continue in force as to all remaining oil and gas leases and interests, and [Emphasis added.]

(a) The party whose oil and gas lease or interest is affected by the title failure shall bear alone the entire loss and it shall not be entitled to recover from the Operator or the other parties any development or operating costs which it may have theretofore paid, but there shall be no monetary liability on its part to the other parties hereto for drilling, development, operating or other similar costs; and

(b) There shall be no retroactive adjustment of expenses incurred or revenues received from the operation of the interest which has been lost, but the interests of the parties shall be revised on an acreage basis, as of the time it is finally determined that the failure of title has occurred, so that the interest of the party whose lease or interest is affected by the title failure will thereafter be reduced in the Contract Area by the amount of the interest lost....

(c) If the proportionate interest of the other parties hereto in any producing well theretofore drilled on the Contract Area is increased by reason of the title failure, the party whose title has failed shall receive the proceeds attributable to the increase in such interests ... until it has been reimbursed for unrecovered costs paid by it in connection with such well.

(d) Should any person not a party to this agreement, who is determined to be the owner of any interest in the title which has failed, pay in any manner any part of the cost of operation, development, or equipment, such amount shall be paid to the party or parties who bore the costs which are so refundable.

(e) Any liability to account to a third party for prior production of oil and gas which arises by reason of title failure shall be borne by the party or parties in the same proportions in which they shared in prior production.....

We believe the language, "which loss results in a reduction of interest from that shown on Exhibit 'A'" unambiguously indicates that loss of title results in loss of interest, which in turn, results in a diminished share of production.

EOG argues the failure of title provision should be interpreted as applying to failures of title in favor of a *third party outside* the operating agreement. EOG

contends that title failure in favor of parties *to* the agreement does not affect any parties' entitlement to share in production. Failure of title provisions "are best designed to cover ... the loss to a third party who is not a part of the [operating] agreement." *Amoco Prod. Co. v. Wilson,* 266 Kan. 1084, 976 P.2d 941, 954 (Kan. 1999). However, EOG's interpretation of the 1978 OA would require this court to change or add language to Article IV, section B.1. This we cannot do. Instead, we must construe the entirety of the 1978 OA in an effort to harmonize and give effect to every part of the agreement so that no part will be rendered meaningless. *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.,* 995 S.W.2d 647, 652 (Tex.1999). We may not rewrite the agreement or add to its language under the guise of interpretation. *See id.* at 161–62. With the exception of subsections (c) and (d), all other subsections of Article IV, section B speak in terms of the parties to the agreement and the consequences to those parties for failure of title. Only subsections (c) and (d) speak in terms of third parties to the agreement. Thus, the 1978 OA provides for the consequence of a failure of title in favor of parties to the agreement and in favor of third parties to the agreement. We conclude that when the failure of title is in favor of *any* party or non-party to the agreement, such "loss [of title] results in a reduction of [the party or parties'] interest from that shown on Exhibit 'A.' " We also conclude that no language in the 1983 Letter Agreement or the amended Exhibit A changes this result.

■ The 1983 Letter Agreement recognized that under the NNG Farmout Agreement, Killam had overriding royalty interests and "certain future reversionary rights following payout of wells drilled by InterNorth, Inc. under" the NNG Farmout Agreement. Pursuant to the 1983 Letter Agreement, Killam waived certain of these rights:

> [The parties] agreed that the overriding royalty interests and reversionary right with regard to Lease "A" shown on the revised Exhibit "A" are hereby waived and this lease along with Lease "C" shall be owned and operated in accordance with the ownership set out on said Exhibit "A". With respect to Lease "B", Killam & Hurd currently have a non-consent status under the three producing wells drilled by InterNorth, Inc. The ownership of these three wells shall presently be 50% Killam & Hurd and 50% HNG reverting to a 75% Killam & Hurd and 25% HNG ownership upon payout of each.

Nothing in the 1983 Letter Agreement indicates the parties intended to change the terms of the 1978 OA or to waive any party's right to enforce the failure of title provision contained in the 1978 OA with regard to Leases B or C. Instead, the stated purpose of the 1983 Letter Agreement was to join all operations in the HNG zones and InterNorth zones under the 1978 OA. Also, nothing in the amended Exhibit A indicates the parties intended to change the terms of the 1978 OA. Instead, the original Exhibit A and the amended Exhibit A serve the same functions: (1) identification of lands subject to the 1978 OA; (2) indicate restrictions, if any, as to depths or formations; (3) indicate the parties' percentages or fractional interests; (4) identify the oil and gas leases and/or oil and gas interests subject to the 1978 OA; and (5) provide the parties' addresses for notice purposes.

For these reasons, we conclude the trial court did not err in rendering summary judgment that neither the 1983 Letter Agreement nor the amended Exhibit A changed the terms of the 1978 OA so as to entitle EOG to share in production from

the InterNorth zones after EOG's title to those zones failed in 1994.

## TITLE TO 640 ACRES

Alternatively, EOG asserts that even if reversion of title was determinative of its rights, a fact issue precluding summary judgment remains on the question of whether EOG retains record title to 640 acres surrounding each NNG well as provided under the NNG Farmout Agreement.

A farmout agreement is a contract to assign oil and gas lease rights in acreage upon the completion of a drilling obligation and performance of other provisions contained in the agreement. *See Eland Energy, Inc. v. Rowden Oil & Gas, Inc.*, 914 S.W.2d 179, 182 n. 1 (Tex.App.-San Antonio 1995, writ denied). Here, the NNG Farmout Agreement sets forth the obligations to be met by NNG before Killam would assign to NNG the leases to the InterNorth zones. After setting forth these obligations, the NNG Farmout Agreement states as follows:

> The assignment referred to ... above shall be subject to the terms of this agreement and to the terms of the leases covering the assigned premises.... *There shall also be provided in the said assignment that the said assignment shall remain in force and effect only as long as you continue to produce oil or gas in commercial quantities.* Neither the current production nor any production hereafter developed by Killam & Hurd, its heirs, successors, or assigns shall be construed as keeping the said assignment in force and effect as to your interests. [Emphasis added.]

The assignment for Lease B states the circumstance under which that assignment remains in force:

> .... This assignment shall remain in force and effect only as long as [NNG], its successors and assigns, continue to produce oil and/or gas in commercial quantities from the described land and no production initiated or developed by Killam & Hurd, Ltd., its successors or assigns shall be construed as keeping this assignment in force and effect as to [NNG's] interest. *Should any of the above described land and/or rights thereto, fail to be continued in force and effect by [NNG] under the terms of this Assignment, the letter agreement, and leases, as set out below, this assignment shall ipso facto terminate as to all of the above described lands and/or rights thereto, save and except as to 640 acres surrounding each [NNG] well, which is producing or capable of producing.*[6] [Emphasis added.]

Neither party disputes that none of the wells at issue were actually producing. Instead, the dispute centers on whether these wells were *capable* of producing. In support of its summary judgment motion, Killam submitted the affidavit of Stephen Marshall who opined that none of the NNG wells on Lease B were capable of production in commercial quantities from 1994 to 1998 because none of the wells could be turned on and begin to flow (produce) in commercial quantities without additional equipment or repair. In response, EOG tendered the affidavit of Andrew Scott, who opined there were NNG wells on Lease B that had encountered zones capable of producing as of 1994. EOG also argued Killam applied an incorrect standard for determining when a well is capable of production. Killam filed a motion to

---

**6.** The underlying dispute is over rights to acreage located on Leases B and C. As to those two leases, only the assignment for Lease B contains the "640 acre" language.

strike Scott's affidavit. The trial court granted the motion to strike and denied EOG's motion for leave to supplement Scott's affidavit. On appeal, EOG asserts the trial court should have granted it leave to amend Scott's affidavit. Killam disagrees and further argues that, even if Scott's affidavit was amended, it was entitled to summary judgment as a matter of law because no wells were capable of production.

#### 1. Scott's Affidavit

 Killam objected to Scott's affidavit on the following grounds: (1) he testified to "alleged conclusions of fact and not to relevant evidentiary facts"; (2) his testimony was speculative and conclusory because he failed to explain his methodology; (3) his testimony was "no more than unsubstantiated legal and factual conclusions unsupported by sufficient evidence"; and (4) his affidavit was not credible because he did not identify the documents on which he relied or attach those documents to his affidavit. In an order dated July 14, 2006, the trial court sustained the objections and excluded Scott's affidavit from evidence. Also on July 14, the trial court signed the order granting Killam's motion for summary judgment. At the August 1, 2006 hearing at which the trial court considered the issue of attorney's fees, EOG asked the court for leave to supplement Scott's affidavit. The court denied the request. EOG asserts the trial court erred in striking Scott's affidavit without granting leave to supplement.[7]

 If a defect in a summary judgment affidavit is one of substance, the trial court is not required to provide an opportunity to amend. *Clendennen v. Williams*, 896 S.W.2d 257, 260 (Tex.App.-Texarkana

1995, no writ). Challenges to summary judgment affidavits as conclusory allege a defect in substance rather than form. *Trejo v. Laredo Nat'l Bank*, 185 S.W.3d 43, 51 n. 9 (Tex.App.-San Antonio 2005, no pet.). Therefore, to the extent the trial court properly found Scott's affidavit to be conclusory, the trial court did not err in denying EOG leave to amend the affidavit. We do not address whether the failure to attach documents to the affidavit was a defect of form or substance because attaching the documents to the affidavit would not have cured the conclusory nature of Scott's affidavit. *See Knetsch v. Gaitonde*, 898 S.W.2d 386, 391 (Tex.App.-San Antonio 1995, no writ) (Duncan, J., concurring) (failure to attach documents upon which expert's affidavit relies is a "purely formal" defect); *EOG Resources, Inc. v. Wall*, 160 S.W.3d 130, 134 (Tex. App.-Tyler 2005, no pet.) (trial court should allow supplementation to cure defects of form).

#### 2. Capable of Production

 As to EOG's argument that Killam applied an incorrect standard for determining when a well is capable of production, EOG does not provide this court with a different standard, but instead, asserts the meaning of "capable of production" may change depending upon the context in which the phrase is used. We disagree.

The Texas Supreme Court approved the following definition of "capable of production in paying quantities" because "it is consistent with existing cases that discuss the difference between actual production and capability of production":

> We believe that the phrase "capable of production in paying quantities" means a

---

7. We do not construe EOG's complaint on appeal as being that the trial court incorrectly sustained Killam's objections to Scott's affidavit. Therefore, we do not address the merits of Killam's objections, and we assume, without deciding, that the objections were properly sustained.

well that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equipment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.

*Anadarko Petroleum Corp. v. Thompson,* 94 S.W.3d 550, 558 (Tex.2002) (quoting *Hydrocarbon Mgt., Inc. v. Tracker Exploration, Inc.,* 861 S.W.2d 427, 433–34 (Tex. App.-Amarillo 1993, no writ)); *see also Grinnell v. Munson,* 137 S.W.3d 706, 716 (Tex.App.-San Antonio 2004, no pet.) (applying same definition).

Applying the *Anadarko* standard, Marshall identifies in his affidavit the various documents he reviewed and five wells that were or had been completed on Lease B in the NNG Farmout Acreage between October 24, 1974 and November 1995. Marshall identified the five wells as "IN" B–1, "IN" B–2, "IN" B–3, B–2, and B–8. With regard to these wells, Marshall stated the following:

> "IN" B–1 was no longer capable of producing after 1984 at the latest because, in 1984, the "well was re-perforated at a depth within the NNG Farmout Acreage after sealing off the perforation in the NNG Farmout Acreage."

> "IN" B–2 was no longer capable of producing as of 1993 when it was plugged and abandoned by Enron.

> In 1993, Enron filed a notice of intent to plug and abandon the "IN" B–3 well, which indicated Enron did not believe this well was capable of producing in paying quantities. The well did not begin to again produce until 1998 when Killam reworked the well by pulling and replacing the tubing, cleaning out the wellbore, re-perforating and then fracing

the well in 1998. Without this workover, the well was not capable of producing in paying quantities in the condition it was in between 1993 and the date Killam reworked the well.

> The B–2 well ceased producing on Lease B in February 1993 and did not produce during the remainder of 1993, or throughout 1994, 1995, 1996, 1997, or 1998. Pursuant to the terms of the 1978 OA, EOG was required to send Killam a notice of the anticipated shutting in of the well prior to doing so if the well was capable of producing. Marshall could find no such notice in Killam's records. Further, this well did not produce at a profit for any month between January 1992 and February 1993 and, therefore, this well could not have produced in commercial quantities upon cessation of production in February 1993 because the well operated at a loss.

> The B–8 well was no longer capable of producing as of 1992 because it was plugged and abandoned by EOG in 1992.

Marshall then opined that, by 1994, none of the five wells were capable of producing in paying/commercial quantities.

Even considering the stricken affidavit of Andrew Scott, EOG did not controvert any of Marshall's factual allegations. As to Marshall's conclusion that the five wells were not capable of production, EOG does not argue that Marshall's factual allegations are insufficient to support the conclusion that the wells would not begin flowing absent additional equipment or repair. Therefore, applying the *Anadarko* standard, we conclude Killam established as a matter of law that the five identified wells were incapable of production in paying quantities. Accordingly, the trial court properly rendered summary judgment that EOG did not retain record title to 640 acres surrounding each NNG well as provided under the NNG Farmout Agreement.

## ATTORNEY'S FEES

In its final issue, EOG asserts the trial court erred in awarding attorney's fees to Killam under the Declaratory Judgment Act because Killam's lawsuit was a suit to try title in which such fees are not available.

The Texas Property Code provides that "[a] trespass to try title action is the method of determining title to lands, tenements, or other real property." Tex. Prop.Code Ann. § 22.001(a) (Vernon 2000). In its petition, Killam characterized its suit as "an action for an estate or interest in real property or to remove an encumbrance from the title to real property located in Webb County." The recovery of attorney's fees under a trespass to try title suit is barred because it is not provided for by the Texas Property Code. *See Martin v. Amerman,* 133 S.W.3d 262, 264 (Tex. 2004).

The Texas Declaratory Judgment Act provides that "[a] person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the instrument [or] contract . . . and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem.Code Ann. § 37.004(a) (Vernon 1997). Attorney's fees are available in a suit for a declaratory judgment. *See id.* § 37.009. In its petition, Killam asked for declaratory relief related to its trespass to try title action. In its petition, EOG also asked for declaratory relief, specifically that the court declare that "oil and gas produced from the Contract Area during the term of the Operating Agreement . . . was now and is now owned by those persons in those percentages described in Exhibit 'A' to the Operating Agreement."

An award of attorney's fees under the Declaratory Judgment Act is not limited to the plaintiff or the party seeking affirmative relief. *Knighton v. Int'l Bus. Mach. Corp.,* 856 S.W.2d 206, 210–11 (Tex. App.-Houston [1st Dist.] 1993, writ denied). Because EOG's lawsuit sought relief under the Declaratory Judgment Act and because Killam was the prevailing party, the trial court did not abuse its discretion in awarding attorney's fees to Killam. *See First City Nat'l Bank of Midland v. Concord Oil Co.,* 808 S.W.2d 133, 138 (Tex. App.-El Paso 1991, no writ); *see also Duncan Land & Exploration, Inc. v. Littlepage,* 984 S.W.2d 318, 333–34 (Tex.App.-Fort Worth 1998, pet. denied) (allowing attorney's fees where prevailing party brought suit to remove cloud on title and for slander of title, as well as for declaration that there had been no reversion of leasehold based on whether well produced in paying quantities).

## CONCLUSION

We overrule EOG's issues on appeal and affirm the trial court's judgment.