MEMORANDUM OPINION


No. 04-07-00778-CV



TEXAS INDEPENDENT EXPLORATION, LTD.,


Appellant



v.



PEOPLES ENERGY PRODUCTION-TEXAS L.P. 

n/k/a Coronado Energy E&P Company, L.L.C.,

Appellee



From the 381st Judicial District Court, Starr County, Texas


Trial Court No. DC-03-385


Honorable Jose Luis Garza, Judge Presiding



Opinion by: Steven C. Hilbig, Justice


Sitting: Sandee Bryan Marion, Justice

 Steven C. Hilbig, Justice

 Marialyn Barnard, Justice


Delivered and Filed: August 31, 2009


AFFIRMED

 Peoples Energy Production-Texas L.P. n/k/a Coronado Energy E&P Company, L.L.C.
("Peoples Energy") sued Texas Independent Exploration, Ltd. ("Texas Independent") for declaratory
judgment seeking a favorable construction of an assignment in an oil and gas lease. Texas
Independent counterclaimed seeking its own declaratory judgment. Both parties moved for summary
judgment based on their interpretations of the assignment. The trial court granted Peoples Energy's
motion and denied Texas Independent's motion. On appeal, Texas Independent contends the trial
court erred in granting Peoples Energy's motion and denying its motion, arguing the trial court
misconstrued the assignment. We affirm the trial court's judgment. 

Background In 1937, the First National Bank of Mission conveyed a 346.67 acre lease ("the Lease") to
Tom Vessels Jr. Vessels later assigned the entire Lease to Sun Oil Company. By 1995, Union
Pacific Oil & Gas Company owned an 80-acre portion of the Lease, which became known as the
Farmout Lease. In 1995, Union Pacific assigned the Farmout Lease to Texas Independent pursuant
to a document entitled "Farmout Agreement." (1) Texas Independent's interest was limited to the
"Farmout Land," which was defined in section 1.12 of the Farmout Agreement as:

 . . . those depths below 6,600 feet below the surface and one hundred feet (100')
below the total depth drilled in the Earning Well . . . but excepts depths below eight
thousand two hundred and forty four (8,244') feet TVD. 


Texas Independent, therefore, was permitted to drill only below 6,660' and above 8,224' ("the
interval"). 

 The Farmout Agreement also contained an option agreement, section 1.10.A, that required
Texas Independent to offer Union Pacific, at cost, up to forty percent (40%) of any interest Texas
Independent might subsequently acquire in any portion of the Lease, proportionately reduced to
Union Pacific's current working interest. (1CR69): 

 Should Farmee [Texas Independent] purchase any royalty, overriding royalty, net
profit or production payment covering any portion of the First Bank of Mission lease,
whether or not part of the Farmout lease . . . then Farmee shall offer to Farmor
[Union Pacific] the opportunity to purchase, at cost, up to 40.0% of the acquired
interest, proportionately reduced to Farmor's current working interest. 


Texas Independent subsequently learned Sun Oil had a reserved interest in the Lease, a 12.5%
overriding royalty interest (2) in all the oil, gas, and hydrocarbons produced from all depths on the
entire 346.67-acre Lease ("the Sun ORRI"). On July 20, 1995, Texas Independent purchased the Sun
ORRI for $100,000. In accordance with section 1.10.A of the Farmout Agreement, Texas
Independent offered Union Pacific the opportunity to purchase forty percent of the Sun ORRI,
proportionately reduced to its current working interest. Union Pacific accepted. It is undisputed that
at the time of the offer, Union Pacific held a "current working interest" of 39.543%. Accordingly,
Union Pacific purchased a 1.97715% share of the Sun ORRI (40% x 12.5% x 39.543%), resulting
in a purchase price of $15,817.20. 

 Because Union Pacific never paid Texas Independent for the portion of the Sun ORRI it
purchased, Texas Independent did not immediately execute the assignment. However, Texas
Independent treated Union Pacific's interest as if it had been assigned by crediting payments to
reduce Union Pacific's unpaid share of the purchase price. Despite the absence of a written
assignment at the time of the offer and acceptance, Union Pacific conveyed its interest in the Sun
ORRI to Sierra by "Assignment, Bill of Conveyance" dated November 15, 1996, and by "Correction
Assignment, Bill of Sale and Conveyance" dated March 20, 1997, and effective July 1, 1996. By
the time Texas Independent had received full payment from Union Pacific by deducting money from
payments due Union Pacific pursuant to its interest in the Sun ORRI, Union Pacific had already
assigned its interest to Sierra. Accordingly, on May 7, 2000, Texas Independent executed an
"Assignment of Overriding Royalty Interest" ("the Assignment") directly to Sierra. The Assignment
is the primary document around which the current controversy is centered. Sierra subsequently
assigned its interest in the Sun ORRI to Peoples Energy via an assignment and bill of sale executed
on April 26, 2001. 

 From 1995 to 2000, Texas Independent completed a number of producing wells in the
interval and paid the holder of the Sun ORRI - Union Pacific, Sierra, or Peoples Energy - the
1.97715% interest on all production. In 2001, production was obtained from wells drilled below the
interval. For two years, Peoples Energy was paid the 1.97715% interest on this production as well,
and Texas Independent executed division orders acknowledging this. However, in 2003, Texas
Independent "discovered" Peoples Energy had been paid the 1.97715% interest from depths below
the interval, and sent Peoples Energy a proposed "Amendment of Assignment of Overriding Royalty
Interest," purporting to amend the Assignment between Texas Independent and Sierra by including
the following restriction: "INSOFAR AND ONLY INSOFAR as to all such production produced
from the subsurface depths of 6, 600 feet to 8, 224 feet." In a letter enclosed with the proposed
amendment, Texas Independent claimed that when it sold the Sun ORRI to Union Pacific, the sale
included only an interest in minerals produced in the interval, and Peoples Energy had been
"overpaid" when it received payment from production from wells below the interval. Texas
Independent requested a retroactive redistribution of payment. Peoples Energy declined.

 In October 2003, Peoples Energy filed a declaratory judgment action seeking a declaration
that it owned the 1.97715% interest in the Sun ORRI as to all production under the Lease without
any regard to a depth restriction. Texas Independent counterclaimed and then filed partial traditional
and no evidence motions for summary judgment seeking a declaration that Peoples Energy's interest
in the Sun ORRI was limited to the interval, Texas Independent owns the Sun ORRI below the
interval, and Texas Independent is entitled to recover monies wrongfully paid to Peoples Energy
from production below the interval. Peoples Energy filed a cross-motion for summary judgment,
arguing that as a matter of law the Assignment was unambiguous and gave Peoples Energy a
1.97715% interest in the Sun ORRI to all depths, and the statute of fraud precluded the Texas
Independent's interpretation of the assignment. The trial court granted Peoples Energy's motion for
summary judgment and denied those filed by Texas Independent. Texas Independent perfected this
appeal. 

Standard of Review

 A no evidence motion for summary judgment should be granted if the non-movant fails to
present more than a scintilla of probative evidence to raise a genuine issue of material fact on the
challenged element. Timpte Indus. v. Gish, 286 S.W.3d 306, 310 (Tex. 2009); Ford Motor Co. v.
Ridgway, 135 S.W.3d 598, 600 (Tex. 2004). A traditional motion for summary judgment is granted
only when the movant establishes there are no genuine issues of material fact and it is entitled to
judgment as a matter of law. Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, No. 07-0490,
2009 WL 1028051, at *3 (Tex. Apr. 17, 2009). An appellate court reviews the grant or denial of a
motion for summary judgment de novo. Id.; Texas Mun. Power Agency v. Pub. Util. Comm'n of
Texas, 253 S.W.3d 184, 192 (Tex. 2007). The denial of a motion for summary judgment is generally
not appealable, but can be reviewed on appeal when both parties moved for summary judgment and
the trial court granted one motion and denied the other. Id. In such cases the appellate court reviews
each summary judgment, determines all questions presented, and renders the judgment the trial court
should have rendered. Id. When the trial court's order does not specify the grounds for summary
judgment, the appellate court must affirm the summary judgment if any of the theories presented to
the trial court and preserved for appellate review are meritorious. Provident Life and Accident Ins.
Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003). 

 Interpretation or construction of an unambiguous contract is a matter of law to be determined
by the court. Coats v. Farmers Ins. Exch., 230 S.W.3d 215, 217 (Tex. App.--Houston [14th Dist.]
2006, no pet.). When the controversy can be resolved by proper construction of an unambiguous
contract, summary judgment is appropriate. Id.; see also Hackberry Creek Country Club, Inc. v.
Hackberry Creek Home Owners Ass'n, 205 S.W.3d 46, 56 (Tex. App.--Dallas 2006, pet. denied)
(citing Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 529 (Tex. 1987)). However, if the contract
is ambiguous, summary judgment is improper because the intent of the parties is a fact issue. 
Hackberry Creek, 205 S.W.3d at 56 (citing Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983; Harris
v. Rowe, 593 S.W.2d 303, 306 (Tex. 1979)). 

Analysis

 In construing a written contract, we must ascertain and give effect to the parties' intentions
as expressed in the four corners of the document. Frost Nat'l Bank v. L & F Distribs., Ltd., 165
S.W.3d 310, 311-12 (Tex. 2005) (per curiam). We consider the entire writing and attempt to
harmonize and give effect to all the provisions of the contract by analyzing the provisions with
reference to the whole agreement. Id. at 312. "No single provision taken alone will be given
controlling effect; rather, all the provisions must be considered with reference to the whole
instrument." J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003). If after the pertinent
rules of construction are applied, a contract can be given a definite or certain legal meaning, it is
unambiguous, and is construed as a matter of law. Frost Nat'l Bank, 165 S.W.3d at 312. 

 Texas Independent and Peoples Energy agree, as do we, that the Assignment is unambiguous. 
Accordingly, we will construe it as a matter of law and render the summary judgment the trial court
should have rendered. See id. Texas Independent contends the Assignment gave Sierra, and
therefore Peoples Energy, a 1.97715% interest in the Sun ORRI, but only from production in the
interval. Peoples contends the Assignment was not restricted to the interval, claiming instead the
Assignment gave Sierra a 1.99715% interest in all production under the entire Lease without any
depth restriction. 

 Pursuant to the Assignment, Texas Independent assigned Sierra a 1.97715% overriding
royalty interest in "100% of all the oil, gas, and other hydrocarbons produced under" the entire
346.67-acre Lease. This is an extremely broad and seemingly unambiguous granting clause. 
Because a deed passes the greatest estate possible unless there are clear and unequivocal exceptions
or reservations, the Assignment would appear to convey to Sierra an interest in the Sun ORRI
without any depth restriction. See Templeton v. Dreiss, 961 S.W.2d 645, 657 (Tex. App.--San
Antonio 1998, pet. denied) (holding deed will be construed to confer upon grantee greatest estate that
terms of instrument will permit). This interpretation is supported by the fact that neither the original
346.67-acre Lease from First National Bank of Mission to Vessels nor the 80-acre Farmout Lease
acquired by Union Pacific contained a depth restriction relating to the Sun ORRI. Rather, the 6,600'-8,244' depth restriction applied only to Texas Independent under the Farmout Agreement for the
Farmout Lease (the 80-acre lease from Union Pacific to Texas Independent). 

 Relying in part on Eland Energy, Inc. v. Rowden Oil & Gas, Inc., 914 S.W.2d 179 (Tex.
App.--San Antonio 1995, writ denied), Texas Independent contends the Assignment contains a
depth restriction because the "subject to" clause in the Assignment references the Farmout
Agreement, and when the documents are read together the interest in the Sun ORRI is limited to the
interval. The "subject to" clause in the Assignment states, in pertinent part: 

 The interest herein conveyed to Assignee is subject to the terms and provisions
contained in the Lease and all prior contracts pertaining thereto, including but not
limited to, the following: 


 1. That certain Farmout Agreement dated April 22, 1995, between Union
Pacific Oil and Gas Company, et al[.], as Farmors and Texas Independent
Exploration, Inc., as Farmee. 


The Assignment is also made "subject to" the assignment of the Sun ORRI to Texas Independent,
and the assignment of Union Pacific's proportionate share in the Sun ORRI to Sierra. 

 Texas Independent argues section 1.10A of the Farmout Agreement, to which the Assignment
is subject, limits Peoples Energy's interest in the Sun ORRI to the "current working interest" held
by Union Pacific, which Texas Independent claims was limited to 1.97715% in the 6,600'-8,224'
interval. Texas Independent contends that to interpret the Assignment in any other way ignores the
"subject to" language, which applied section 1.10A of the Farmout Agreement to the Assignment. 
According to Texas Independent, but for section 1.10A, neither Union Pacific nor its successors in
interest would have had any right to the Sun ORRI, and therefore by inserting the "subject to"
language in the Assignment, the parties inserted the "proportionate reduction" and "current working
interest" limitations into the Assignment. 

 Countering Texas Independent's argument, Peoples Energy contends reversal is not
warranted because: (1) Texas Independent incorrectly concludes the "subject to' clause has only one
possible construction, (2) Texas Independent's reliance on this court's opinion in Eland is misplaced,
(3) none of the following provides for a relevant depth restriction - section 1.10A of the Farmout
Agreement, the term "working interest," or the Sun ORRI chain of title, and (4) Texas Independent's
interpretation of the Assignment conflicts with general rules of contract construction. Peoples
Energy concludes the trial court correctly granted its motion for summary judgment because a proper
interpretation of the Assignment establishes it conveyed to Sierra a 1.97715% interest, i.e., the
"current working interest," to the minerals under the 346.67-acre Lease without regard to depth. 

Construction of "Subject To" Clause

 Texas Independent contends the trial court erred in granting summary judgment in favor of
Peoples Energy because to do so required the court to ignore the "subject to" clause, thereby
rendering it meaningless in violation of the rules of construction. See J.M. Davidson, 128 S.W.3d
at 229 (holding that in ascertaining true intent of parties as expressed in instrument, court must
consider entire writing in effort to harmonize and give effect to all provisions so that none will be
rendered meaningless). We disagree.

 The phrase "subject to" is a limitation of a grant, defining the nature, extent, and character
of the estate conveyed. Cockrell v. Tex. Gulf Sulphur Co., 157 Tex. 10, 16, 299 S.W.2d 672, 676
(1956); Petro Pro, Ltd. v. Upland Res., Inc., 279 S.W.3d 743, 750 (Tex. App.--Amarillo 2007, pets.
denied). "It neither conveys an interest to the assignee, nor does it reserve or retain an interest in
favor of the assignor." Petro Pro, 279 S.W.3d at 750; see Wright v. E.P. Operating Ltd. P'ship, 978
S.W.2d 684, 688 (Tex. App.--Eastland 1998, pet. denied) (holding conveyance made no reservation
even where it was "subject to" prior recorded reservation). Rather, it simply limits the extent of the
interest granted. Petro Pro, 279 S.W.3d at 750. As such, it "is a term of qualification and not of
contract[,]" and "[t]here is nothing in the use of the words 'subject to,' in their ordinary use, which
would even hint at the creation of affirmative rights." Kokernot v. Caldwell, 231 S.W.2d 528, 531
(Tex. Civ. App.--Dallas 1950, writ ref'd). The principal function of a "subject to" clause is to
protect a grantor against a breach of warranty claim. Walker v. Foss, 930 S.W.2d 701, 706 (Tex.
App.--San Antonio 1996, no writ). Conveying land "subject to" defined interests is merely a means
of providing notice of outstanding interests that may affect a grantee's title. PYR Energy Corp v.
Samson Res. Co., 470 F.Supp.2d 709, 717 (E.D. Tex. 2007) (citing Wright, 978 S.W.2d at 688). 

 Here, the summary judgment evidence establishes Texas Independent offered and sold the
interest in the Sun ORRI to Union Pacific by way of letters that never mentioned a depth restriction. 
Texas Independent subsequently assigned the Sun ORRI to Sierra without mentioning a depth
restriction. Sierra did not participate in the previous transaction between Union Pacific and Texas
Independent, and Texas Independent had nothing to do with the transaction between Union Pacific
and Sierra. Therefore, in interpreting the Assignment and its "subject to" clause, the trial court,
considering the facts and circumstances surrounding the execution of the Assignment (3), could have
concluded the clause was intended merely to (1) document the chain of title, (2) insulate Texas
Independent from claims by Union Pacific (or its successors) that Texas Independent had wrongfully
assigned the deed to Sierra, and/or (3) insulate Texas Independent from claims of breach of warranty
by Sierra. See Wright, 978 S.W.2d at 688; Walker, 930 S.W.2d at 706. Moreover, the trial court
could have concluded the "subject to" clause did not impose the depth restriction applicable to the
Farmout Land, i.e., the 80 acres assigned by Union Pacific to Texas Independent under the Farmout
Agreement, on other portions of the 346.67-acre Lease. Finally, the trial court knew the "subject to"
clause could not be used to describe the land to which the Sun ORRI applied nor to restrict it, and
thus the parties must have intended it to have another meaning. See Averyt v. Grande Inc., 717
S.W.2d 891, 894-95 (Tex. 1986) (holding "subject to" clause does not limit land description). 

 Accordingly, given that the meanings and effects of "subject to" clauses can vary given the
particular circumstances, Texas Independent's contention that the trial court necessarily ignored the
"subject to" clause when it granted summary judgment in favor of Peoples Energy is incorrect. 

Eland Energy, Inc. v. Rowden Oil & Gas, Inc.

 Texas Independent also contends the trial court erred in granting summary judgment in favor
of Peoples Energy because it failed to follow this court's decision in Eland. According to Texas
Independent, Eland is directly on point and mandates that we interpret the "subject to" clause to limit
Peoples Energy's interest in the Sun ORRI to the interval. We have carefully reviewed Eland and
must again disagree with Texas Independent. 

 First, Eland is not a contract construction case. See 914 S.W.2d at 184-88. Rather, it deals
with issues relating to limitations, statute of frauds, laches, estoppel, and a non-assignability clause. 
Id. Second, regarding the "subject to" clause, our discussion in Eland revolved around Eland
Energy's limitations claim, and we merely held the clause could not "be ignored" and it had to "be
assumed that the parties intended that it have meaning." Id. at 185. We agree with our statements
in Eland, but its holding does not mandate the interpretation of the "subject to" clause proposed by
Texas Independent. 

 In Eland, the parties executed a farmout agreement covering what was known as the Perez
Lease. Id. at 182. Under the agreement, the farmor agreed to assign the farmee "40 acres in the form
of a square as nearly as possible" around each producing well completed by the farmee. Id. After
the farmee completed the first well under the agreement, he suggested to the farmor that it would be
easier if the farmor assigned the entire Perez Lease to the farmee. Id. If the farmee failed to develop
any portion of the lease, he would later assign these portions back to the farmor. Id. This
conditional assignment stated it was "subject to" the terms and provisions of the farmout agreement,
which included a continuous drilling obligation and provided the manner in which ownership could
be acquired. Id. Subsequently, Eland Energy, a successor-in-interest to the farmee, attempted to
escape the reassignment provision, refusing to reassign the undeveloped portions of the lease back
to the farmor after drilling ceased. Id. at 183. When Eland Energy refused to reassign the
undeveloped land as required by the farmout agreement, the farmor and numerous successors-in-interest to the farmee filed suit to clear title, arguing that pursuant to the farmout agreement and the
conditional assignment, Eland Energy was required to reassign the undeveloped portions of the lease
back to the farmor. Id. Eland Energy claimed it did not have to reassign the land to the farmor and
was entitled ownership of the undeveloped portions of the lease because, among other things, the
farmor's suit sought specific performance to convey real property and was barred by limitations. Id. 
The trial court found in favor of the farmor and the successors-in-interest, and this court affirmed
the judgment. Id. at 181, 184. 

 In affirming the trial court's judgment, this court rejected Eland Energy's statute of
limitations claim. In our analysis, we noted the "subject to" clause of the conditional assignment was
at the "crux" of Eland Energy's limitations claim. Id. at 185. We then held the farmout agreement
and the conditional assignment had to be read together or the "subject to" clause would be rendered
meaningless. Id. We further held the clause could have but one meaning -that despite the
assignment of the entire Perez Lease to the farmee, the farmee could only acquire equitable title in
the lease by earning it pursuant to the farmout agreement, i.e., by drilling producing wells. Id. 
Because Eland Energy did not produce wells on the property at issue, it did not acquire any equitable
interest in that property. Accordingly, the farmor's claim could not be characterized as a specific
performance action to convey real property, Eland Energy had nothing to convey, and the four-year
statute of limitation did not apply. Id. at 186. 

 Our holding in Eland requires only that a "subject to" clause not be ignored or rendered
meaningless. There is no evidence the trial court ignored the clause simply because it failed to
accept Texas Independent's interpretation of it. 

 This case and Eland share commonalities only with regard to the documents involved: a
mineral lease, a farmout agreement, and an assignment that is "subject to" the farmout agreement. 
In all other respects the cases are drastically different: 

 Eland involved a conditional assignment of a lease made to modify the mechanics
of a farmout agreement. The present case involved an unconditional assignment of
an ORRI in "100% of the oil, gas and other hydrocarbons" under a lease in order to
satisfy an option agreement that happened to be contained in a farmout agreement. 


 Eland concerned a conveyance of bare legal title and reservation of equitable title. 
Here, there was no dispute that full title passed.


 It was undisputed in Eland that the original contracting parties intended to reassign
the undeveloped tracts back to the farmor. In the present case Texas Independent
disputed the intent evidenced in the Assignment to convey the Sun ORRI with no
depth restriction. 


 Most importantly, the farmout agreement in Eland involved the same interest in land
as the assignment made subject to it. In contrast, the Farmout Agreement involved
the 80-acre Farmout Lease, while the Assignment involved the Sun ORRI, which
covered the entire 346.67-acre Lease. Unlike Eland, even when the Farmout
Agreement and the Assignment are read together, it does not necessitate a finding of
a depth restriction related to the Sun ORRI. The depth restriction related only to the
Farmout Agreement between Texas Independent and Union Pacific, and limited
Texas Independent's interest to the interval. No such limitation is applicable to the
Sun ORRI. 


Accordingly, our holding in Eland does not mandate a finding that the "subject to" clause's reference
to the Farmout Agreement and other assignments inserted a depth with regard to the Sun ORRI. 

Section 1.10A of the Farmout Agreement

 Texas Independent places a great deal of reliance on section 1.10A of the Farmout Agreement
to challenge the summary judgment in favor of Peoples Energy. As noted above, section 1.10A
provides that if Texas Independent purchased any royalty or overriding royalty interest in any portion
of the 346.67-acre Lease (not just the 80-acre lease assigned to it by Union Pacific), Union Pacific
had an option to purchase up to forty percent of the purchased interest, proportionally reduced to its
current working interest. (2CR541) Texas Independent claims this is the source of the depth
restriction to which the Sun ORRI is subject. Texas Independent's reliance is misplaced for two
reasons: (1) section 1.10A is nothing more than an option agreement, and (2) Texas Independent's
interpretation of section 1.10A would render meaningless the part of section 1.10A that gives Union
Pacific the option to purchase any interest Texas Independent might purchase on "any portion" of
the 346.67-acre Lease. 

 Section 1.10A is merely an option contract that happens to be in a farmout agreement. See
Probus Props. v. Kirby, 200 S.W.3d 258, 261 (Tex. App.--Dallas 2006, pet. denied) (stating that
in option to purchase property, optioner offers to sell property on stated terms for specific period of
time, and optionee has right to accept or decline); see also Restatement (Second) of Contracts
§ 25 (1981) (stating option contract is promise meeting requirement for formation of contract, but
that limits promisor's power to revoke offer). Section 1.10A's only function, based on its
unambiguous language, is to obligate Texas Independent to offer a part of any interest it might
purchase in the Lease to Union Pacific for purchase. Once the option was exercised, it no longer
existed, unless and until Texas Independent purchased some other interest in the lease. Rather, a
binding, bilateral contract was formed and the previous relationship of Texas Independent as
optioner and Union Pacific as optionee ceased, and a new relationship of grantor and grantee arose,
requiring Texas Independent to execute an instrument to convey the interest purchased to Union
Pacific. See, e.g., Pitman v. Sanditen, 626 S.W.2d 496, 498 (Tex. 1981); Luccia v. Ross, 274 S.W.3d
140, 148-49 (Tex. App.--Houston [1st Dist.] 2008, pet. denied). Once the conveying instrument
was executed, in this case the Assignment, all prior transactions between Texas Independent and
Union Pacific and its successors-in-interest to the Sun ORRI were merged into the Assignment, and
all of the parties' rights rested solely in the Assignment. See Alvarado v. Bolton, 749 S.W.2d 47,
48 (Tex. 1988) (holding that where deed is delivered and accepted as performance of contract to
convey, contract merges into deed and deed alone determine parties' rights); GXG, Inc. v. Texacal
Oil & Gas, 977 S.W.3d 403, 415 (Tex. App.--Corpus Christi 1998, pet. denied) (holding doctrine
of "merger by deed" operates to merge all prior transactions between parties into deed). 

 Here, as a mere option contract, once the Assignment was executed, the parties' rights in the
Sun ORRI was controlled by the Assignment, and no longer had a separate effect. Accordingly,
Section 1.10A cannot supply the depth restriction claimed by Texas Independent. 

 Additionally, if we were to accept Texas Independent's interpretation that section 1.10A
provided a depth restriction with regard to the Assignment of the Sun ORRI, it would render another
portion of section 1.10A meaningless and limit Union Pacific's rights under the Farmout Agreement. 
Section 1.10A gave Union Pacific an option to purchase if Texas Independent purchases "any
portion" of the 346.67-acre Lease. It is undisputed that but for the depth restriction placed on Texas
Independent with regard to the Farmout Land (the 80-acre lease from Union Pacific to Texas
Independent), there is no depth restriction on the other portions of the Lease. If section 1.10A limits
the optionee to only the interval, the option to purchase royalties obtained by the optioner on "any
portion" of the Lease is rendered meaningless. Such an interpretation would be contrary to the rules
of construction. See J.M. Davidson, 128 S.W.3d at 229 (holding that in ascertaining true intent of
parties as expressed in instrument, court must consider entire writing in effort to harmonize and give
effect to all provisions so that none will be rendered meaningless). 


"Working Interest"

 We also reject Texas Independent's argument that the use of the term "working interest" in
section 1.10A imposed a depth restriction on the Sun ORRI obtained by Union Pacific. Texas
Independent attempts to ascribe a meaning to "working interest" that conflicts with definitions
espoused by other courts, as well as the parties' use of it in this case. 

 "[A] working interest is generally understood to mean a mineral interest created by a
leasehold." Broesche v. Jacobson, 218 S.W.3d 267, 272 (Tex. App.--Houston [14th Dist.] 2007,
pet. denied); see also Geodyne Energy Income Prod. P'ship I-E v. Newton Corp., 161 S.W.3d 482,
486 n.10 (Tex. 2005) (describing "gross working interest" as "percentage share of all expenses and
revenues . . . plus any royalties attributable to the working interest."). It may also be used to denote
an interest in mineral rights. Broesche, 218 S.W.3d at 273. Texas Independent cites no authority
for the proposition that the use of the term "working interest" in section 1.10A supplied a depth
restriction to the royalty interest purchased by Union Pacific. 

 Moreover, the summary judgment evidence reflects the parties in this case used "working
interest" to refer to a percentage of ownership. In section 4.3.5 of the Farmout Agreement, the
parties agreed that if the Farmout Lease covered less than the entire mineral estate described therein,
or if Union Pacific's "working interest" was less than one hundred percent, then any retained or
reversionary interest of Union Pacific would be proportionately reduced. "Working interest" was
clearly used to refer to Union Pacific's percentage of ownership. Additionally, when Texas
Independent offered Union Pacific the Sun ORRI, as required by section 1.10A, Texas Independent
described Union Pacific's working interest as 39.543%, not as a depth restriction. Also, the
Assignment conveys a 1.97715% interest in the Sun ORRI, and this percentage could only have been
calculated using the working interest as a percentage of ownership: 12.5% (the Sun ORRI purchased
by Texas Independent) multiplied by 40% (the percentage of interest Union Pacific was entitled to
purchase) multiplied by 39.543% (Union Pacific's working interest). Texas Independent used this
exact calculation in its offer letters to determine Union Pacific's pro rata share of the purchase price,
confirming the parties use of "working" interest as a percentage of ownership, not a depth restriction. 

 If Texas Independent is correct that "working interest" connotes a depth restriction, the
calculation set forth above would be different. Texas Independent paid $100,000 for a 12.5%
overriding royalty interest in all the mineral produced from all depths in the entire 346.67-acre Lease. 
When Texas Independent offered the Sun ORRI to Union Pacific as required, it did not apportion
the purchase price to account for a depth restriction. As Peoples Energy points out, if Union Pacific
purchased the Sun ORRI with a depth restriction, the purchase price should have been reduced;
however, Texas Independent sought payment based on the $100,000 it paid for the non-restricted
interest. 

 Finally, the summary judgment record includes a division order, dated 2001, which was after
Texas Independent executed the Assignment and two wells had been drilled to more than 8,244'. 
If Texas Independent's interpretation of working interest were correct, the 2001 division order would
show Texas Independent as the owner of a 12.5 overriding royalty interest in the two wells drilled
below 8,224'. However, the division order reflects Texas Independent owns a 10.522850%
overriding royalty interest (the original 12.5% purchased from Sun less the 1.97715% purchased by
Union Pacific and later assigned to Sierra). (2CR608) Texas Independent confirmed this division
order and signed it, signaling its recognition that "working interest" mean percentage of ownership
unrelated to depth. 

 Accordingly, Texas Independent's attempt to impose a depth restriction through the term
"working interest" is an improper interpretation of the term according to the law as well as the
summary judgment evidence. 

Rules of Construction

 In addition to violating basic rules of construction by rendering meaningless a portion of
section 1.10A as discussed above, Texas Independent's interpretation of the Assignment - the
"subject to" clause, section 1.10A, and the term "working interest" - violates the rule of construction
that grants are to be liberally construed in favor of the grantee, and exceptions strictly construed
against the grantor. Baker v. Henderson, 137 Tex. 266, 276, 153 S.W.2d 465, 470 (1941); Chambers
v. Huggins, 709 S.W.2d 219, 221 (Tex. App.--Houston [14th Dist.] 1986, no writ). It also ignores
the basic rule that reservations and exceptions in grants must be clear and specific; courts do not
favor reservations by implication. Sharp v. Fowler, 151 Tex. 490, 494, 252 S.W.2d 153, 154 (1952);
Derwen Res., LLC v. Carrizo Oil & Gas, Inc., No. 09-07-00597-CV, 2008 WL 6141597, at *6 (Tex.
App.--Beaumont May 21, 2009, pet. filed) (mem. op.). To properly make a reservation or
exception, it should be mentioned in the granting clause and fully set out thereafter. Derwen, 2008
WL 6141597, at *6 (citing 55 Tex. Jur.3d Oil and Gas § 65 (2004)). Here, Texas Independent was
clearly capable of limiting Union Pacific's interest in the Sun ORRI to the 6,600'-8,224' interval if
that had been its intention. Depth restrictions are not novel in the oil and gas industry. Finally, to
adopt Texas Independent's interpretation would be to allow Texas Independent's current, subjective
intent to control over the intent as expressed in the Assignment, which is impermissible. See Frost
Nat'l Bank, 165 S.W.3d at 311-12 (in construing a written contract courts must give effect to intent
as expressed in four corners of document). 

Conclusion

 We hold the Assignment, even when considered with the Farmout Agreement, is capable of
but one interpretation: that Union Pacific, pursuant to section 1.10A, purchased a percentage of the
Sun ORRI, proportionately reduced, without regard to depth. Texas Independent's attempt to
transfer the depth restriction imposed on it under the Farmout Agreement to the subsequent Sun
ORRI by way of the "subject to" clause, section 1.10A, or the term "working interest" is
incongruous. The only depth restriction in this case arose in the Farmout Agreement between Union
Pacific and Texas Independent. That depth restriction limited Texas Independent's interest in the
Farmout Land to the 6,600'-8,224' interval. The Sun ORRI, on the other hand, entitled its owner to
an overriding royalty interest in all the minerals produced from all depths in the entire Lease. 
Accordingly, we overrule Texas Independent's issues and affirm the trial court's judgment. (4) 


 Steven C. Hilbig, Justice
1. A "farmout agreement" is an assignment by a lease owner of all or part of the lease to another operator who
wants to drill on the lease. Mengden v. Peninsula Prod. Co., 544 S.W.2d 643, 645 n.1 (Tex. 1976); ExxonMobil Corp.
v. Valence Operating Co., 174 S.W.3d 303, 313 (Tex. App.--Houston [1st Dist.] 2005, pet. denied). The primary
characteristic of a farmout agreement is the assignee's obligation to drill one or more wells on the assigned land as a
prerequisite to the completion of the transfer. Id. 
2. An "overriding royalty interest" is a non-participating interest in an oil and gas lease. Ridge Oil Co. v.
Guinn Invs., Inc., 148 S.W.3d 143, 155 (Tex. 2004). An owner of an overriding royalty "has no right and thus no ability
to go onto the underlying property and drill or otherwise take action to perpetuate a lease." Id. Rather, such an owner
is dependent on the lessee to preserve the lease. Id. 
3. See EOG Res., Inc. v. Killam Oil Co., 239 S.W.3d 293, 298 (Tex. App.--San Antonio 2007, pet. denied)
(holding court may consider facts and circumstances surrounding execution of contract as construction aid). 
4. Given our disposition, we need not address Peoples Energy's alternate contention that the statute of fraud
precludes Texas Independent's interpretation of the Assignment.