**Opinion issued April 18, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00742-CV

————————————

## THE ESTATE OF TYLER D. TODD, Appellant

## V.

## INTERNATIONAL BANK OF COMMERCE, Appellee

On Appeal from the 125th District Court
Harris County, Texas
Trial Court Case No. 2009-21107A

## MEMORANDUM OPINION

Appellant, the estate of Tyler Todd ("Todd"), challenges the trial court's rendition of summary judgment in favor of appellee, International Bank of Commerce ("IBC"), in IBC's suit against him for breach of a guaranty agreement

and attorney's fees.  In three issues, Todd contends that the trial court erred in granting IBC summary judgment.

We reverse and remand.

## Background

In its petition, IBC alleged that Todd and Dan Silvestri had executed personal guaranty agreements, each promising to pay one-half of the outstanding debt owed to IBC by Rainsong Partners, Ltd. ("Rainsong"), which had defaulted on three promissory notes secured by real estate liens.  IBC further alleged that concurrent with the execution of the promissory notes, Todd and Silvestri had signed their guaranty agreements, under which they were each liable for fifty percent of "the outstanding principal amount at the time of demand for payment, accrued and unpaid interest, late charges, [attorney's] fees, collection costs, and all other sums owing" by Rainsong to IBC.  IBC asserted that both Todd and Silvestri defaulted in their obligations and brought suit for breach of the guaranty agreements.[1]

In his answer, Todd generally denied IBC's allegations and asserted that "the foreclosure sale price of the property securing the indebtedness sought to be recovered was less than the fair market value of such property on the date of the

---

[1]  This Court recently issued an opinion concerning Silvestri's appeal from the judgment in *Silvestri v. International Bank of Commerce*, No. 01-11-00921-CV, 2013 WL 485804 (Tex. App.—Houston [1st Dist.] 2013, no pet. h.).

2

foreclosure sale" and IBC "only is entitled to seek a deficiency judgment equal to the difference between the amount owing on the note" and "the fair market value of the Mortgaged Property." In his counterclaim against IBC, Todd also sought attorney's fees from IBC if "successful in reducing and/or eliminating the indebtedness sought to be recovered" by IBC. The trial court later severed IBC's suit against Todd from its suit against Silvestri.

In its summary-judgment motion, IBC asserted that the express terms of the guaranty agreements alone entitled it to judgment as a matter of law. And it noted that on April 2, 2009, it made to Todd its final demand of repayment before foreclosing on the properties on April 7, 2009. IBC attached to its motion the real estate lien notes and guaranty agreement, which contained an addendum that provides,

> Anything in the Guaranty to the contrary notwithstanding, the term "Guaranteed Indebtedness," with respect to principal only, shall mean fifty percent (50%) of the outstanding principal amount at the time of demand by Lender on Guarantor for payment on the Guaranty of all of Borrower's obligations to Lender (the "Obligations"), without giving effect to any prior or contemporaneous payment by any other guarantor(s). Accordingly, for the purposes of calculating Guarantor's liability pursuant to the Guaranty, the amount of the Obligations shall not be reduced by any payment or payments made by any other guarantor(s) on any of the obligations. The term Guaranteed Indebtedness shall also include fifty percent (50%) of all accrued and unpaid interest, late charges, attorneys' fees, all costs incurred by Lender in connection with the Borrower to Lender arising in connection with the Obligations . . . .

3

IBC asserted that, at the time of demand, there was $858,251.80 owing on the first note, $2,285,185.44 owing on the second note, $924,838.62 owing on the third note, and $1,459,666.94 in accrued interest, expenses, and attorney's fees, for a total balance due of $5,527,942.80. It maintained that it was entitled to recover from Todd one-half of this amount, or $2,763,971.40. IBC also attached to its motion its winning bids at the foreclosure sale, which indicated that the three properties were sold to IBC for a combined total of $1,694,000. However, IBC argued that Todd was not entitled to a credit for the price paid at the foreclosure sale because, at the time of demand, the foreclosure sale had not taken place.

In his response to IBC's summary-judgment motion, Todd asserted that the promissory notes were all secured by deeds of trust. He attached to his motion each of the deeds of trusts, which contained identical addendums that define the "Mortgaged Property" for each note to include:

> [A]ll permits, licenses, franchises, certificates, utility commitments and/or reservations, wastewater capacity reservations and other rights and privileges obtained in connection with the property described hereafter.

The addendums to the deeds of trust further provide:

> 4. <u>Fair Market Value for Calculating Deficiencies</u>. Notwithstanding the provisions of §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantors agree that Beneficiary shall be entitled to seek a deficiency judgment from Grantors and any other party obligated on the Note or guaranty of the Note equal to the

4

difference between the amount owing on the Note and fair market value of the Mortgaged Property as hereinafter determined.

Todd asserted that the addendum unambiguously provides that IBC is entitled to recover a deficiency judgment from Todd only if IBC proved the fair market value of the mortgaged property and IBC presented no competent evidence of the fair market value. Todd further asserted that the fair market value of the properties "exceeded the entire indebtedness" and "eliminate[d] all deficiency against Todd." Finally, Todd asserted that IBC's claims for attorney's fees were "grossly excessive."

Todd attached to his response the affidavit of Jack L. Hughey, a real estate appraiser. Hughey testified that he reviewed an appraisal dated February 23, 2009, prepared for IBC by Barletta & Associates, valuing the properties at $2,420,000. Hughey stated that the Barletta appraisal was "incomplete" because it failed to include the value of Municipal Utility District ("MUD") receivables, which had been previously appraised by Barletta & Associates "on an 'as completed' basis" at $3,455,000 on February 1, 2006. Based on audit reports from the MUD's accountant, Hughey testified that IBC had received $988,688 in receivables from a 2011 bond sale. Hughey also testified that e-mails between Rick Alejo and Alan Hirshman, two of the engineers for the MUD, indicated that more than $2,000,000 in receivables remained to be reimbursed in future bond sales. Hughey concluded

5

that, as of April 7, 2009, the value of the real estate was at least $2,420,000 and the value of the MUD receivables was at least $1,800,000. Todd also filed a "Motion to Determine the Fair Market Value of the Property" with the trial court.

In its reply to Todd's response, IBC asserted that the guaranty agreement "expressly sets forth the manner by which 'Guaranteed Indebtedness' will be calculated for purposes of determining liability against Todd," without reference to the deeds of trusts or their addendums. IBC argued that, even if Todd was entitled to a credit for the fair market value of the property, the burden of establishing the credit rested with Todd and he had "contractually waived any offset defense." Finally, IBC asserted that Todd's evidence of fair market value was irrelevant and inadmissible.

IBC also filed objections to Todd's summary-judgment evidence. IBC specifically objected to Hughey's affidavit on the grounds that it refers to "inadmissible hearsay" and is irrelevant, unreliable, and conclusory. It asserted that the October 31, 2005 appraisal, from which Hughey based his valuation of the MUD receivables, constitutes hearsay and is too far removed from the date of the foreclosure sale to rely upon. Finally, IBC argued that any speculation regarding the value of the MUD receivables is "unreliable and conclusory" because the properties at issue were never developed.

6

The trial court granted IBC's summary-judgment motion, and it entered a final judgment that IBC recover $2,763,971.40 in actual damages from Todd, including $122,788.63 in attorney's fees and $10,000 for post-judgment collection actions.

## Standard of Review

To prevail on a summary-judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and there is no genuine issue of material fact. Tex. R. Civ. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995). When a plaintiff moves for summary judgment on its claim, it must establish its right to summary judgment by conclusively proving all the elements of its cause of action as a matter of law. *Rhone Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell*, 193 S.W.3d 87, 95 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). When deciding whether there is a disputed, material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts must be resolved in his favor. *Id.* at 549.

## Breach of Guaranty Agreement

In his first issue, Todd argues that the trial court erred in granting IBC summary judgment because it refused to consider evidence of the fair market value of the properties. In his second issue, Todd argues that the trial court erred in granting IBC summary judgment because it did not take into account the value of the MUD receivables.

### *Construction of the Guaranty*

Our primary concern in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Usually, the intent of the parties can be discerned from the instrument itself. *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 312 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When an issue regarding the construction of a contract is presented, we must examine and consider the entire writing in an effort to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless. *Seagull Energy E & P, Inc.*, 207 S.W.3d at 345. Contract terms will be given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Dorsett*, 164 S.W.3d at 662. When the parties have entered into an unambiguous contract, the courts will enforce the

intention of the parties as written in the instrument. *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981).

A guarantor's liability is measured by the principal's liability unless a more extensive or more limited liability is expressly provided for in the guaranty. *W. Bank–Downtown v. Carline*, 757 S.W.2d 111, 113 (Tex. App.—Houston [1st Dist.] 1988, writ denied). To determine the extent of the guarantor's liability, we look to the language of the guaranty agreement. *Id.* If the guaranty agreement is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and we construe the contract as a matter of law. *Id.* at 114. If uncertainty exists as to the meaning of the guaranty contract, and if two reasonable interpretations may be made, we apply the construction most favorable to the guarantor. *Coker v. Coker*, 650 S.W.2d 391, 394 & n.1 (Tex. 1983) (explaining that "guarantor is entitled to have his agreement strictly construed so that it is limited to his undertakings, and it will not be extended by construction or implication"); *Clarke v. Walker–Kurth Lumber Co.*, 689 S.W.2d 275, 278 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

IBC largely relies on the following provision, found in the addendum to the guaranty, for the proposition that Todd was not entitled to a credit for the fair market value of the properties,

> Anything in the Guaranty to the contrary notwithstanding, "Guaranteed Indebtedness," with respect to principal only, shall mean

9

fifty percent (50%) of the outstanding principal amount at the time of the demand by Lender on Guarantor for payment on the Guaranty of all Borrower's obligations to Lender (the "Obligations"), without giving effect to any prior or contemporaneous payment by any other guarantor(s). Accordingly, for the purposes of calculating Guarantor's liability pursuant to the Guaranty, the amount of the Obligations shall not be reduced by any payment or payments made by any other guarantor(s) on any of the Obligations. The term Guaranteed Indebtedness shall also include fifty percent (50%) of all accrued and unpaid interest, late charges, attorneys' fees, all costs incurred by Lender in connection with the collection of the Obligations and the enforcement of the Guaranty, and all other sums owing by Borrower to Lender in connection with the Obligations, and all documents securing payment thereof and executed in connection therewith . . . .

IBC argues that because the addendum provides that "Guaranteed Indebtedness . . . shall mean fifty percent (50%) of the outstanding principal amount at the time of demand," it provides a "method for ascertaining the guaranty liability" and constitutes a "formulaic guaranty." The same addendum later provides that "[c]apitalized terms used in this Addendum shall have the same meaning as ascribed to such terms in the Guaranty unless defined otherwise herein."

IBC argues that the Deeds of Trust and their Addendums are not relevant to Todd's liability because Todd is not a party to them. However, the guaranty defines "Guaranteed Indebtedness" as "all liabilities and obligations of Borrower . . . to Lender," including, but not limited to, "any indebtedness, however evidenced, whether by promissory note, bookkeeping entry, electronic transfer, checks, drafts or other items, or by any other manner or form." It specifically

10

guarantees "the performance and discharge of the obligations of Borrower specified under any and all promissory notes, letters of credit, and all other documents and instruments (the "Security Instruments") executed by Borrower and/or other parties in connection with the Guaranteed Indebtedness." Thus, the guaranty itself references the documents comprising the underlying transaction in describing Todd's obligations.

Furthermore, the language and the context of the guaranty addendum reflect that its purpose was not to provide the sole "method for ascertaining the guaranty liability" as proposed by IBC. Immediately after the sentence providing that fifty percent of the principal balance is due "at the time of demand," the guaranty addendum states that, "[a]ccordingly, for the purposes of calculating Guarantor's liability pursuant to the Guaranty," Todd's obligations "shall not be reduced by any payment or payments made by any other guarantor(s)." Thus, the purpose of the guaranty addendum was to provide that one guarantor's repayment of his obligations did not discharge the other's obligations. Its purpose was not to provide a "formula" or the sole method for calculating the underlying obligations.

Accordingly, we look to the underlying documents to determine the extent of Todd's obligations. *See Carline*, 757 S.W.2d at 113 (providing that guarantor's liability is measured by principal's liability unless "expressly set forth in the guaranty agreement" that guarantor's liability is to be measured otherwise); *First*

11

*Union Nat. Bank v. Richmont Capital Partners I, L.P.*, 168 S.W.2d 917, 924 (Tex. App.—Dallas 2005, no pet.) ("Because a guaranty is ancillary to the underlying contract, a dispute as to the rights and obligations of the guarantor can only be resolved by a factual determination of the rights and obligations of the parties to the underlying contract.").

In its brief, IBC notes that the Todd guaranty was executed "[c]oncurrent with the execution of the Real Estate Lien Notes." Separate instruments or contracts executed at the same time, for the same purpose, and in the course of the same transaction are to be considered as one instrument, and are to be read and construed together. *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981). Instruments may be construed together even though they are not between the same parties. *Id.*

Here, each real estate lien note incorporates the deeds of trust, stating that,

> Payment hereof is secured by a vendor's lien retained in Deed of even date herewith, to the Borrower, and is additionally secured by a Deed of Trust, Security Agreement, and financing Statement of even date herewith, executed by the borrower and/or Granters thereof . . . .

The addendums to the deeds of trust further provide,

> 4. Fair Market Value for Calculating Deficiencies. Notwithstanding the provisions of §§ 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law, Grantors agree that *Beneficiary shall be entitled to seek a deficiency judgment from Grantors and any other party obligated on the Note or guaranty of the Note equal to the difference between the amount owing on the Note and fair*

12

> *market value of the Mortgaged Property* as hereinafter determined.

(Emphasis added.) Thus, the addendums to the deeds of trust, not the guaranty, provide the specific formula for calculating the underlying liability, i.e., the difference between the amount owing on the notes and the fair market value of the mortgaged properties. And they provide that IBC is entitled to seek this amount from the Grantors and "any other party obligated on the Note or guaranty of the Note."

A review of all of the documents reveals that the intent of the parties was not for IBC to be entitled to foreclose on the properties and then also receive the full value owing on the notes from the guarantors, but instead to be made whole by being entitled to foreclose upon the properties and then receive the remaining portion of the debt not satisfied through foreclosure from the liable parties. Under IBC's construction, it could receive a windfall by receiving the full amount of the indebtedness from the individual guarantors, plus the fair market value of the property it holds upon foreclosure, which, looking at all of the documents, would circumvent the intent of the parties and go beyond merely making IBC whole.

IBC relies on two cases for the proposition that the addendum to the guaranty entitles it to apply any offset first to the portion of the indebtedness not guaranteed by Todd: *Preston Ridge Financial Services Corporation v. Tyler*, 796 S.W.2d 772 (Tex. App.—Dallas 1990, writ denied) and *Humphreys v. Amwest*

13

*Savings Association*, No. 05-94-00969-CV, 1995 WL 479603 (Tex. App.—Dallas Aug. 8, 1995, no writ) (mem. op.) (not designated for publication). In *Tyler*, the defendant, Tyler, signed a guaranty agreement, personally guaranteeing a portion of the amount due under a promissory note secured by real property. 796 S.W.2d at 774. The guaranty provided that Tyler was to pay "when due" all interest on the note and "that amount of principal indebtedness equal to the amount by with the sum of the outstanding principal balance of the indebtedness . . . exceeds $735,000." *Id.* Tyler argued that because the guaranty agreement provided that he was to pay the guaranteed portion of the indebtedness "upon demand," and the plaintiff had already foreclosed upon the properties before it had made a demand, he was entitled to a credit from the foreclosure proceeds, thereby reducing the guaranteed indebtedness below $735,000. *Id.* at 778. The court held that Tyler's liability was measured by the principal's liability, which became fixed when the principal defaulted on the note before the foreclosure sale. *Id.* at 779. The court specifically noted that the guaranty was only for a portion of the underlying debt and that Preston Ridge would not receive a windfall by applying the foreclosure proceeds to the unguaranteed portion of the debt. *Id.* at 780.

Likewise, in *Humphreys*, the defendant, Humphreys, executed a real estate lien note, secured by a deed of trust, that provided that he was personally liable for "all amounts of principal due at any time in excess of $432,149.00." 1995 WL

14

479603 at \*1. The deed of trust similarly limited Humphreys's personal liability to any amount due in excess of $432,149. *Id.* Humphreys argued that proceeds from a foreclosure sale should be applied first to the portion of the debt on which he agreed to be personally liable. *Id.* at \*3. The court concluded that the principal became due at the time of the acceleration, when no foreclosure sale had occurred, so Humphreys was liable for all of the debt in excess of $432,149, without first applying a credit for the foreclosure sale. *Id.* Again, the court noted that only a portion of the debt was guaranteed, so the plaintiff was entitled to apply any foreclosure proceeds to the unguaranteed portion of the debt. *Id.* at \*3–4.

Here, unlike in *Preston Ridge* and *Humphreys*, the entire portion of the debt was guaranteed by Todd and Silvestri, and IBC would receive a windfall were it able both to foreclose on the properties and recover the entire indebtedness from both guarantors, which the transaction documents expressly disallowed. And, most importantly, the documents comprising the underlying debt specifically provided a credit for the fair market value of the properties.[2] *See Carline*, 757 S.W.2d at 113.

---

[2] Because we hold that the deeds of trust are controlling and separately provide a credit for the fair market value of the properties, we need not address the parties' arguments concerning the default statutory provisions that provide a credit for proceeds from a foreclosure sale. *See* TEX. PROP. CODE ANN. § 51.003 (Vernon 2007).

15

IBC further argues that Todd contractually waived his right to an offset in the guaranty agreement. Specifically, IBC asserts that the following provision of the guaranty amounts to a waiver:

> The liability of Guarantors shall remain and continue in full force and effect notwithstanding . . . (iv) any defenses or rights of set-off or counterclaims with Borrower may have or assert.

The addendums to the deeds of trust provide that IBC is entitled to seek a deficiency judgment from the borrowers or "any other party obligated on the Note or guaranty of the Note." Thus, the addendums to the deed of trust do not provide a right to an offset, but, rather, the means by which IBC could recover its deficiency judgment, and the amount owed under the guaranty before any offset.

Finally, in regard to the MUD receivables, the addendums to the deed of trust define "Mortgaged Property" to include:

> [A]ll permits, licenses, certificates, utility commitments and/or reservations, wastewater capacity reservations and other rights and privileges obtained in connection with the property herein, . . .

> [A]ll rights, rents, revenues, benefits, leases, contracts, accounts, general intangibles, money, instruments, documents, tenements, hereditaments and appurtenances now or hereafter owned by Grantors and appertaining to, generated from, arising out of or belonging to the above-described properties or any part thereof.

IBC asserts that, nevertheless, Todd "failed to present any evidence or legal support that the MUD receivables were part of the property sold at foreclosure." The addendums to the deed of trust require that the indebtedness be offset by the

fair market value of the property. And the above provisions clearly provide for the inclusion of MUD receivables as a "benefit," "contract," or "general intangible . . . appertaining to, generated from, arising out of or belonging to" the properties and thus are appropriately a part of any fair market value assessment of the properties.

Furthermore, Todd presented evidence that Rainsong had completed its obligations entitling it to collect the MUD receivables. Todd attached to his response to IBC's summary-judgment motion three receipts, signed by IBC in 2011, indicating it had received three payments from the MUD. The receipts state that "Rainsong made all payments due to the contractors under the Construction Contracts in accordance with the terms of the Financing Agreement" and "Rainsong executed an Assignment of Agreements, assigning some or all of its right to receive funds from the District to IBC."

### *Evidence of Fair Market Value*

IBC also argues that, even if Todd is entitled to a proportional credit for the fair market value of the properties, he failed to satisfy that burden because he "failed to present any competent evidence of the fair market value of the property on the date of foreclosure." Todd asserts that he presented proper summary-judgment evidence creating a "fact issue sufficient to defeat the Bank's summary judgment."

Todd attached Hughey's affidavit to his response to IBC's summary-judgment motion. Relying upon an appraisal from Barletta made only two months before the foreclosure sale, Hughey valued the properties at $2,420,000, which he testified was a reasonable value as of April 7, 2009, the date of the foreclosure sale. Hughey also noted that the maximum bid prices at the foreclosure sale, which were attached to IBC's summary-judgment motion, totaled $2,240,000, and IBC had been able to sell 31 vacant lots on the properties at $20,000 per lot. The summary-judgment evidence also included IBC's winning bids at the foreclosure sale, which totaled $1,694,000. IBC argues that because it took place two months prior to the foreclosure sale, the appraisal is irrelevant and Hughey's reliance on it is conclusory. However, a respondent to a summary-judgment motion is "'not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements.'" *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (quoting Tex. R. Civ. P. 166a(i) cmt. (1997)).

Indulging every reasonable inference in favor of Todd and taking his evidence as true, we conclude that he at least presented a material issue of fact regarding the fair market value of the properties, precluding the granting of summary judgment in favor of IBC. Accordingly, we hold that the trial court erred in granting IBC summary judgment. *See Nixon*, 690 S.W.2d at 548–49.

We sustain Todd's first and second issues.

18

**Attorney's Fees**

In his third issue, Todd argues that the trial court erred in awarding IBC attorney's fees because they are "unreasonable," he presented evidence that "creates a fact issue concerning the Bank's attorney's fees," and IBC's evidence supporting the award of attorney's fees is "conclusory and insufficient."

The guaranty provided for the award of attorney's fees as follows,

> In the event any legal action or arbitration proceeding is commenced in connection with the enforcement of any declaration of rights under this Guaranty and/or any instrument or written agreement required or delivered under or pursuant to the terms of this Guaranty or the Guaranteed Indebtedness, and/or any controversy or claim, whether sounding in contract, tort or statute, legal or equitable, involving in any way the Guaranteed Indebtedness, or any other proposed or actual loan or extension of credit involving Borrower, *the prevailing party* shall be entitled to recover reasonable and necessary attorneys' fees, paralegal costs, expert witness fees and costs, expenses and costs and other necessary disbursements made in connection with any such action or proceeding, in the amount determined by the fact-finder or arbitrator.

(Emphasis added.) A prevailing party is the party "who successfully prosecutes the action or successfully defends against it, prevailing on the main issue." *See Johns v. Ram Forwarding, Inc.*, 29 S.W.3d 635, 637–38 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Thus, the guaranty expressly granted an award of attorney's fees only for the prevailing party. Having held that the trial court erred in granting IBC summary judgment, we further hold that the trial court erred in awarding IBC its attorney's fees at this juncture. *See Probus Props. v. Kirby*, 200 S.W.3d 258,

265 (Tex. App.—Dallas 2006, pet. denied) (reversing trial court's award of attorney's fees to plaintiff, after holding that trial court erred in not granting defendant judgment notwithstanding the verdict, because plaintiff was no longer "prevailing party" under their contract).

We sustain Todd's third issue.

## Conclusion

We reverse the judgment of the trial court and remand for proceedings consistent with this opinion.

Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.